HARRIS *v.* DOE, on the Demise of BARNETT and Another.

<span>4b 369, 138 492</span>

<span>4b 369 f167 275</span>

After a trial in a civil suit had commenced, the jury were permitted, by consent of parties, to disperse until the next day. One of the jurors failing to appear on the next day, the jury were discharged and another immediately impanelled. *Held*, that this proceeding was not erroneous.

A treaty with the Indians, so far as respects the grants of land to individuals contained in it, is evidence of the grantees' title, and, as such, proper to be laid before a jury.

47

Nov. Term,
1837.

HARRIS
v.
DOE.

An Indian is not a competent witness under the statute of the state; but the Supreme Court cannot presume that a witness, admitted as competent in the Circuit Court, was an Indian, merely because he was the principal chief of an Indian nation.

The seal of the general land office, and the signature of the commissioner thereof, to copies of papers required by law to be deposited in that office, *prima facie* prove themselves.

If from the expressions in a grant, &c. respecting real estate, it is doubtful to what object it refers, or it is evident that a mistake in the description of the boundaries has been committed, or if the boundaries be insufficiently described in it, extrinsic evidence, even parol, is admissible to explain the instrument.

The oath of one of several plaintiffs to the loss of an instrument of writing, is sufficient to let in secondary evidence of its contents.

The construction of treaties, deeds, &c., belongs to the Court as a matter of law.

A special act of congress respecting a grant of real estate to an individual under an Indian treaty, can have no efficacy, if passed subsequently to the grantee's death, in confirming his title; but the act may be evidence for a jury, in explanation of the treaty, relative to the situation of the land.

A verdict in accordance with the weight of the testimony and with justice, ought not to be set aside on account of an erroneous instruction given by the Court to the jury.

Thursday,
November 30.

APPEAL from the *Allen* Circuit Court.

DEWEY, J.—This was an action of ejectment on the several demises of *Barnett* and *Hanna* against *S. Harris, E. B. Harris*, and *M. Harris*, for a tract of land described in the declaration as situate in the county of *Allen*, and as being "the south-east or upper section of two sections of land, on the west side of *St. Mary's* river, of a survey made by the surveyor general of the public lands of the *United States*, prior to the seventh day of *May*, 1823, for *Francis Lafontaine* and son, under a treaty made by *Jonathan Jennings*, *Lewis Cass*, and *Benjamin Parke*, commissioners on the part of the *United States*, and the *Miami* nation of Indians of the other part, entered into on the sixth of *October*, 1818." Verdict against *S. Harris*, and in favour of *E. B. Harris* and *M. Harris*. Judgment accordingly. *S. Harris* prosecutes this writ of error.

Various points are presented upon the record by bills of exceptions.

1. A jury was impanelled, who, having heard a part of the testimony, was, by consent of parties suffered to disperse during an adjournment of the Court over night. On the next morning one of the jurors failed to appear; whereupon the Court discharged the jury, and caused another to be immedi-

ately impanelled, and the trial to proceed. The impanelling of the second jury and trying the cause at the term which the Court was then holding, is objected to as erroneous.

There was no error in this proceeding. It was a matter of course, that the second jury should be impanelled and the trial proceed without delay, unless some cause, other than the discharge of the first jury, had been shown to the contrary. If the second panel was illegal, it should have been challenged. If either party was rendered unready to proceed in consequence of what had happened, he should have presented his affidavit pointing out the difficulty. Otherwise, there was no ground for a continuance of the cause to another term.

2. The lessors of the plaintiff were suffered to give in evidence to the jury, the treaty between the *United States* and the *Miami* Indians, made the sixth of *October*, 1818, at *St. Mary's*—the same mentioned in the declaration.

This treaty contains a grant of two sections of land to *Francis Lafontaine* and son, so ambiguously expressed as to leave it doubtful on which side of the *St. Mary's* river the land is situate. The defendants objected to its admission on the grounds,—that as being a public law of the land, it was not a subject-matter of evidence for the jury,—and that as the land described in the declaration lies on the west side of the *St. Mary's*, and one clause of the treaty refers to the land granted to *Lafontaine* and son as being on the east side, there was a variance which should have excluded the testimony. This treaty under the constitution of the *United States*, is, undoubtedly, obligatory upon our Courts as public law; but it also partakes of the character of a contract. It contains several grants to individuals besides that to *Lafontaine* and son, and is partially descriptive of the boundaries of the premises granted. In this view it is the evidence of the title of the grantees, and embraces testimony in reference to matters of fact involving private interest, proper to be laid before a jury, subject, however, like other written instruments, to the right of the Court to pronounce its legal effect. So far as these individual grants are concerned, this treaty is like a private act of legislation, of which Courts do not officially take notice, but which must be specially pleaded or proved, like other matters of fact affecting property and private rights. The variance suggested does not exist, as will be seen when we shall attend to the

construction of the treaty. We are of opinion that this evidence was properly admitted.

3. *Richardville* was permitted to give evidence as a witness, the objection of the defendants to his admissibility being overruled. The ground on which this objection is attempted to be sustained is, that *Richardville* was an Indian, and, therefore, not competent as a witness under the statute of this state. The objection would be valid were it founded on fact. But we are not informed by the record that the witness was an Indian. The bill of exceptions and the treaty of *St. Mary's* give him the description of "principal chief of the *Miami* nation of Indians." This at most could be considered only as presumptive evidence of the fact assumed, and is rebutted by the fact of his being admitted to testify by the Court below, which acted on the inspection of the judges. It is not new in the history of the Indian tribes, that a white man should be their chief.

4. The lessors of the plaintiff offered in evidence a copy of a plat and description, made by the surveyor general, of "sundry Indian reserves on the *St. Mary's* river granted to individuals,"—among which are the two sections granted to *Lafontaine* and son, located on the west side of the river. This document is authenticated by the certificate of the commissioner of the general land office, under his seal of office, stating it to be "a true copy of the plat and description of the reservation of two sections for *Francis Lafontaine* and son, in connection with the reservation of *Joseph Beaubien*, and for the son of *G. Hunt*, under the *St. Mary's* treaty of the sixth of *October*, 1818, as returned to this office by the surveyor general." The signature and official character of the commissioner were proved; but no evidence was offered that the seal was that of the general land office. The defendants objected to the admission of the testimony, but the Court overruled the objection, and the copy thus authenticated was given in evidence.

The only fault found with this decision is, that the seal affixed to the copy was not proved to be that of the general land office. We do not think that this objection is well taken. By the act of congress of the 25th of *April*, 1812, sec. 4, it is provided that the commissioner of the general land office shall provide a seal of office; and that "copies of any records, books,

or papers belonging to said office, under the signature of said commissioner, or, when the office shall be vacant, under the signature of the chief clerk, and the said seal, shall be competent evidence in all· cases in which the original records, books, or papers could be evidence." The original of the paper in question legally belonged to that office, and like other "records, books, and papers" deposited there by law, could not be removed. By the. common law rules of evidence, a sworn copy would have been competent testimony; but to compel suitors all over the *United States*, to procure evidence·of that character from the offices of the federal government, would be attended with great inconvenience. To obviate this evil, congress has provided that copies, certified under the seals of the state and treasury departments, and of the land and post offices, shall be received as evidence in all cases in which the original could be evidence. To require proof of the genuineness of these seals would be attended with. difficulty, little, if any, less than that of procuring sworn copies. We are, therefore, of opinion that it was the design of congress to place the seals of these offices on a footing with the seals of Courts of record; and that consequently the seal of the general land office, and the signature of the commissioner, to copies of originals required by law to be deposited in that office, *prima facie* prove themselves.

We have seen no case in which this question has been raised in the federal Courts; though several cases have been decided in those tribunals, in which the seals of some of the offices before mentioned have been received in evidence without question of their authenticity, or proof of their genuineness. *U. States* v. *Benner*, 1 Bald. R. 234.—*U. States* v. *Willard et al.*, 1 Paine's R. 539.—*Bleecker* v. *Bond*, 3 Wash. Rep. 529.—*Smith* v. *U. States*, 5 Peters, 292. In *New-York*, certificates under the seals of the secretaries of state, and the treasury, have been considered in the character of *exemplifications* of records of Courts. *Peck* v. *Farrington et al.*, 9 Wend. 44. *Catlett et al.* v. *The Pacif. Ins. Co.* 1 Wend. 561.

5. The lessors of the plaintiff also offered in evidence a special act of congress, confirming the location and survey, made by the surveyor general on the west side of the river, of the two sections of land granted to *Lafontaine* and son by the treaty of *St. Mary's*, and declaring the same valid under

Nov. Term,
1837.

HARRIS
v.
DOE.

the treaty. This act was passed *June* the 30th, 1834, at which time the elder *Lafontaine* was dead. They also offered to prove by parol, that that location and survey were made at the request of *Lafontaine,* and under the direction of the Indian agent. Both the special law and the parol testimony were given in evidence against the objection of the defendants.

This act of congress, passed after the death of *Lafontaine,* could have no efficacy in creating or confirming in him a title to the land; and in this point of view, it was not competent evidence: but in another aspect—as explanatory of the treaty, which is the source of his title, both the law and the parol testimony were admissible. And on this principle alone is it, that the admission of the location and survey (which we have just considered in reference to the authentication of the copy) can be sustained.

We are aware that no general doctrine of law is better settled, than that an instrument of writing cannot be varied or contradicted by extrinsic evidence—whether documentary or parol. But it is also settled, that when such an instrument, especially if it be a grant or a charter, is so equivocally expressed as to render it doubtful to what object it refers, or evident that a mistake has been committed in the description of the premises granted, as to location or boundaries, it is competent to resort to evidence *aliunde*—even parol testimony—for the purpose of ascertaining that object, or of explaining and elucidating the ambiguity which creates the difficulty. 8 Term R. 379.—*Wadley* v. *Bayliss,* 5 Taunt. 752.—*Beaumont et ux.* v. *Field,* 1 B. & Ald. 247.—*Doe, ex. d. Bainbridge,* v. *Statham et al.* 7 D. & Ry. 141.—*Lessee of Dinkle* v. *Marshall,* 3 Binn. 587.—*White* v. *Eagan,* 1 Bay's R. 247.—*Middleton* v. *Perry,* 2 Bay's R. 539.—*Helm* v. *Small,* Hardin's Rep. 369. *Steele's Heirs* v. *Taylor,* 3 Marsh. 225.—*Chapman* v. *Bennett,* 2 Leigh's Rep. 329.

There is an ambiguity of expression, evidently amounting to a mistake, in those clauses of the treaty of *St. Mary's* which have reference to the two sections of land granted to *Lafontaine* and son. In one part, they are located adjacent to land granted to *Richardville,* on the east side of the river; in another, they are said to adjoin a tract granted to the son of *G. Hunt,* on the opposite bank. These portions of the treaty,

therefore, come directly within the principle of law above
stated, and are susceptible of explanation by extrinsic evi-
dence.   But even if this incongruity in the terms of the treaty
had not existed, other testimony than that arising from that
instrument, would have been necessary to show most of the
boundaries of the land granted to *Lafontaine* and son.   The
treaty designates no other bounds than abutting it on one side,
either on the land of *Richardville*, or on that of the son of *G.
Hunt;* nor was it under the circumstances existing at the
time, practicable to give it a minute description.   It was a
small portion of a large tract of unsurveyed land ceded by the
*Miami* Indians to the *United States*, by the same treaty which
contains the grant to *Lafontaine* and son.   Metes and bounds
could only be given to this grant, by means of a subsequent
survey, which must from the beginning have been contemplat-
ed by all parties concerned.   That survey has been made
under the authority of the *United States*, with the approbation
of *Lafontaine*, as early as 1823, he not then having parted
with his interest in the land; this location was afterwards
sanctioned,—by him as the record shows, by asking permis-
sion, as he was bound to do by the treaty, of the president of
the *United States* to sell the land so surveyed,—by the presi-
dent in granting that permission,—and finally by the federal
government, as late as 1834, by enacting the special law of
congress.   These facts, constituting a practical construction of
the treaty through a course of years, explaining the ambiguity
of its terms, and indicating the land intended to be granted to
*Lafontaine* and son, were, we think, correctly suffered to go
to the jury.

6. *Hanna*, one of the lessors of the plaintiff, having made
an affidavit of the loss of a written petition presented to Presi-
dent *Monroe* by *F. Lafontaine*, for leave to sell one of the sec-
tions of land granted to him and his son by the treaty of *St.
Mary's*, and surveyed by the surveyor general, and also of the
loss of the original permission to sell, granted by the presi-
dent and indorsed on the petition, the plaintiff offered in evi-
dence sworn copies of the petition and license.   They were ob-
jected to by the defendants; but the objection was overruled.

It is urged that these copies were not competent, because
only one of the lessors of the plaintiff swore to the loss of the
originals; and because authenticated copies from the treasury

department, or some other department of the federal government, would have been evidence of a higher character. These objections cannot be sustained. The oath of one of several plaintiffs to the loss of an instrument of writing, is sufficient to let in secondary evidence of its contents. The affidavit in this case is positive to the fact of loss. The oath of the other lessor could only have been cumulative testimony; for we cannot presume that it would have contradicted the affidavit of *Hanna*. *Turnipseed* v. *Hawkins*, 1 M'Cord, 272. If there is any difference as to the competency of sworn and certified copies of papers in any case, there is no reason for noticing the distinction on this occasion, because we do not know that the papers in question were actually registered, or required by law to be registered, in any public office. The originals themselves, as testified by *Hanna*, had been in his possession, and were lost.

Three deeds, through which the lessors of the plaintiff derived title from *F. Lafontaine*, were given in evidence. As every question arising from their admission has been attended to in the previous points of this case, it is unnecessary to notice them further than to say they were competent testimony.

7. The evidence being closed, the defendants moved the Court to instruct the jury that they "must construe the deeds and the treaty given in evidence by inspection, and could not receive evidence of their meaning in case an ambiguity is discovered on their face." This instruction the Court refused to give, but charged the jury, "that although the treaty might designate the reservation of said land to *Lafontaine* to be on the east side of the *St. Mary's* river, and although the deed from *Lafontaine* to *Barnett* and *Hanna* for said land describes it as it is described in the treaty, or refers to said treaty for its description, and although the said *Lafontaine* died long before the special act of congress had passed, leaving one son who is still alive, still the jury might receive as evidence and look upon the special law of congress, as confirming the fee to the said land on the west side of the *St. Mary's* river to *Lafontaine;* and that said deed from him to *Barnett* and *Hanna*, as grantees from the said *Lafontaine*, would vest in the said *Barnett* and *Hanna*, the title in fee to the said land on the west side of said river." The defendants excepted to the re-

fusal of the Court to instruct as requested, and to the charge given. It could not be error to refuse to instruct the jury by what rule *they* should construe the treaty and deeds; because the construction of those instruments belonged to the Court as a matter of law; and connecting them with the explanatory facts in the case, and leaving the whole to the jury, the instruction asked for would have been wrong according to the principles which we have already decided. The charge which the Court gave—that although the treaty and deeds located the land granted to *Lafontaine* on the east side of the *St. Mary's* river, the act of congress, which passed after his death, confirmed a title in him to land on the west side of the river, was erroneous. The charge should have been, that the jury should judge whether the ambiguous treaty as explained by the extrinsic testimony, did or did not vest in *Lafontaine* the title to land situated on the west side of the river, and that their verdict should be accordingly. The instruction given, though erroneous, however, had a tendency to lead the jury to a correct result: and it is a rule of law, that the misdirection of the judge is no cause for setting aside a verdict, which is in accordance with the weight of testimony and with justice. *Sinard* v. *Patterson*, 3 Blackf. 353.—*Edmonson* v. *Machell*, 2 T. R. 4.—*Seare* v. *Prentice*, 8 East, 348.—*Depeyster* v. *Col. Ins. Co.* 2 Caines, 85. We have looked through the evidence, which is all spread upon the record, and are satisfied that the verdict against the plaintiff in error, at least, is right.

*Per Curiam.*—The judgment is affirmed with costs. To be certified, &c.

*J. Rariden*, *J. S. Newman*, and *D. H. Colerick*, for the appellant.

*H. Cooper*, for the appellee.