Jeptha V. Johnson *vs.* The State of Georgia.

No. 10.—JEPTHA V. JOHNSON, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] On an indictment for a rape, the prisoner may be found guilty of an assault with intent to commit the offence.

[2.] In crimes which require force as an element in their commission, there is no substantial difference between an assault with intent, and an assault with *attempt* to perpetrate the offence.

[3.] Witnesses may be competent, and yet their testimony attended with circumstances, which may be calculated, more or less, to impair its credit or weaken its force with the jury.

[4.] The Civil Law abounded in restrictions upon the admission of testimony. Its principle was *exclusion*, whenever any possible motive could operate, to produce falsehood.

[5.] The same principle grew up at an early period in England, while juries were composed of rude and illiterate men.

[6.] At the present day, the Courts both in England and in this country, are constantly struggling to enlarge the rules for the admission of testimony.

[7.] The Act of '27, *Victoria, ch.* 85, for "improving the law of evidence," is very good as far as it goes, but stops short of the necessities of the age.

[8.] Truth, common sense and enlightened reason, demand the abolition of all artificial rules, which withhold from the jury any fact, which would assist them in finding a right verdict.

[9.] In criminal trials, before the examination commences, either the State or the defendant may require, that the witnesses should retire, in order to each being questioned in the absence of the others.

[10.] Positive testimony must always outweigh that which is negative. Where one witness testifies, that a fact transpired at a given place, and as the witness supposed, between the hours of eight and ten in the forenoon; and another swears that he was in the neighborhood of the place from seven o'clock in the morning till two in the afternoon, and saw nothing of it, the apparent inconsistency may be reconciled, by supposing that one or both of the witnesses was mistaken as to the exact time.

[11.] A verdict in accordance with the weight of evidence and with justice, ought not to be set aside on account of an erroneous instruction given by the Court, to the jury. Much less will it be disturbed under such circumstances, because it is apprehended, the jury may have misunderstood the charge given them by the Court.

[12.] If counsel have reason to fear, that the jury do not understand the instructions given to them, they should suggest it at the time of trial, in order that the Judge may be more explicit.

Jeptha V. Johnson *vs.* The State of Georgia.

Indictment for rape, in Heard Superior Court. Tried before Judge Hill, April Term, 1853.

This was an indictment, containing two counts: The first in the usual form, for the offence of rape on Susan Stallings. The second count charged the defendant with an assault with intent to commit a rape; but in the stating part, it alleged, that the defendant "violently and feloniously did make an assault on her, the said Susan Stallings, and then and there, forcible and against her will, her the said Susan Stallings, violently and feloniously did attempt to ravish," &c. On this indictment, defendant was arraigned and put on trial.

It appeared from the testimony of Susan Stallings, a young girl fourteen years of age, that she was returning one Saturday morning to her father's house, from her brother-in-law's; that about half a mile from her father's, the prisoner, whom she had never seen before, met her in the road; he was on horseback—she walking. He stopped and asked her some questions about where certain persons lived, which she answered and passed on; that prisoner dismounted, left his horse standing in the road, and overtook her, seized her, and attempted violence upon her person; but did not effect his purpose. After she was released, she ran home, and immediately told the circumstances to her mother. Her description of the person fixed suspicion on the prisoner; and a warrant was issued for his arrest. He was arrested, and taken to the house of the girl's father, and she, as soon as she saw him, declared him to be the same who had attempted the outrage. This story was corroborated by her mother, as to all that occurred at and after her return.

Defendant relied on circumstances conflicting with the account given by Miss Stallings. He proved, by his brother, B. F. Johnson, that he had left home that morning riding a young filly, that would not have stood in the road, if left as stated. He introduced a Miss Barker, to prove that he wore a different coat on that day, from the one described; and a Mr. Evans, to prove that he, Evans, was hewing logs, at the

Jeptha V. Johnson *vs.* The State of Georgia.

hour the crime was said to have been perpetrated, very near the road where it occurred, and saw no one pass. When Miss Barker had testified, she was asked if she had not heard what kind of dress Susan Stallings had said the prisoner had on ; this question was objected to by defendant, but the Court permitted it to be asked, saying, it might go as a·circumstance to the jury to affect her credibility ; to which decision and remark defendant excepted.

When Mr. Evans was offered by the defendant, he was objected to by the State, because all the witnesses, on both sides, had been ordered to leave the Court house during the examination ; and he had come in, in disobedience to the order. The witness stating that he was not aware of the order, the Court admitted him to testify ; but said, the circumstance might go to affect his credibility ; to which remark defendant excepted. When the evidence was closed, the defendant requested the Court, among other things, to note that if at any time during the transaction, the female acquiesced in the attempt, it ceased to be a rape, and the defendant could not be convicted. This charge, the Court refused to give, but stated to the jury, that "it was not necessary to give such a charge in this case, if they believed the testimony of Susan Stallings to be true; as there was no evidence, except circumstantial, which was not to be believed in preference to the reliable testimony of a credible witness, of acquiescence or consent on the part of the young lady; unless circumstantial evidence was to overrule positive testimony, of which the jury will judge, as also from the circumstances, whether the evidence was true, and if not whether she consented or not; if she did at first, and afterwards resisted ; or if refusing at first, she afterwards ceased to resist, the jury would judge of the motive of her ceasing ; if with a view to participate in the gratification, the defendant could not be guilty ; but if because she found resistance useless, or from fright, it would still be forcible and against her will; and he would be guilty." The Court further charged the jury, that "if one witness of equal knowledge and credibility swears positively to a fact,

and fifty swore negatively, that they did not see or know the fact, the one witness swearing positively, and not contradicted or inconsistent, is to be believed in preference to the fifty swearing negatively." To which charges the defendant excepts.

The jury returned a verdict of guilty of an assault, with intent to commit a rape—and defendant moved in arrest of judgment, on the ground, that no such offence was charged in the bill of indictment.

The Court overruled the motion and defendant excepted—

And on the several rulings, decision and charges of the Court, excepted to as stated, the defendant assigns error.

WRIGHT & DOUGHERTY, for plaintiff in error.

TIDWELL, Sol. Gen. for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The first ground which we shall consider in this case, is the motion made to arrest the judgment: 1st. Because the indictment contains no charge for an assault with intent to commit a rape ; and 2ndly. Because there is no charge in the bill of indictment to support the verdict.

There are two counts in the indictment. The first alleges, that the prisoner, " with force and arms, on and upon one Susan Stallings, violently and feloniously did make an assault, and her, the said Susan Stallings, did forcible and against her will, ravish and carnally know." The second charges the defendant with the offence, " of an assault with intent to commit a rape." For that the accused did, " with force and arms, on and upon the said Susan Stallings, violently and feloniously make an assault, and forcibly and against her will, did her, the said Susan violently attempt to ravish and carnally know."

The jury found the prisoner guilty of an assault, with intent to commit a rape.

It is insisted, that under neither of these counts was it com-

petent for the jury to render the verdict, which they did; and that, therefore, the judgment of the Court should be arrested.

We hold it to be a sound as well as a universal rule in criminal pleading, that whenever the defendant is charged with the major offence, and the evidence does not support it—that the jury may convict of any minor offence, which is included in the major, and to which the testimony applies upon the familiar maxim, that *omne majus continet in se minus.* If the party comes prepared to defend himself against the greater, of course his proof must necessarily apply to the less. And this rule often, nay, usually operates beneficially for defendants. It gives them certain privileges, as for instance : in challenging jurors, to which they would not be entitled, if tried directly for the minor offence.

And this principle is virtually embodied in the 45th section of the 14th division of the Penal Code, (*Cobb* 840,) which declares, that upon the trial of an indictment *for any offence,* the jury may find the accused not guilty of the offence charged in the indictment; but guilty of an *attempt* to commit such offence, without any special count in said indictment for such attempt.

We hold, therefore, that the verdict of the jury was good under the first count; which was for rape.

[2.] We believe it can be maintained, also, under the second count.

The grand jurors, in this Court, charge the prisoner with an assault with intent to commit a rape. And in the body of the count, it is alleged, that with force and arms he made an assault upon Susan Stallings, and forcible and against her will, attempted to ravish her. It is argued, that we must look to the body of the count for the character and description of the offence; and that there the *attempt* is charged, and not an assault with intent to ravish.

Is there any difference between an assault with *attempt* to ravish, and an assault with intent to ravish ? We do not deny that there is a distinction between an intent and an attempt to do any thing. The former implies the purpose only ; the latter

an actual effort to carry that purpose into execution. But the question is, whether in crimes, which require force as an element in their commission, there is any substantial difference between an assault with intent, and an assault with attempt to perpetrate the offence? We think not.

What is an assault? It is an *attempt* to commit a violent injury. Consequently, an assault with intent to commit a rape, is an *attempt*, by violence to commit a rape. The verdict under this Court was in conformity with the indictment. And we are the better satisfied with this conclusion, as the Code declares that every indictment shall be sufficient, which charges the offence so plainly, that it may be easily understood by the jury. Under the first count, the jury must have understood that the defendant was charged with the offence of rape. And under the second, with an attempt by violence, to commit the crime.

[3.] The second error assigned is, that the Court in refusing the motion to reject as witnesses, Miss Barker and Mr. Evans, stated in the hearing of the jury, that the facts disclosed, in relation to these witnesses, while they did not render them incompetent, might nevertheless go to the jury to affect their credit.

The circumstances were these:—Miss Barker was offered by the defendant to disprove the identity of the accused, who was her brother-in-law. He proved that he wore different clothes, to what was testified to on the trial, by Miss Stallings. She was asked, if she had not been previously informed of what Miss Stallings testified to as to the dress of Johnson? She admitted she had. And upon this fact being disclosed, the Solicitor General moved to reject her testimony altogether.— But the Court very properly held, that it did not destroy her competency, but that it was a circumstance which might be considered by the jury as affecting her credit.

And we think the Court was right. Who would not repose more confidence in the statements of Miss Barker, if she had not heard the representation which Miss Stallings gave of Johnson's dress? Read her testimony as it is reported in this

Jeptha V. Johnson *vs.* The State of Georgia.

record, and the propriety of this ruling will be made manifest. She does not swear positively that the defendant did not wear on that day the dark overcoat testified to by the girl, whom he abused: but reasons to show that he probably did not.

Evans stands on a different footing. An order had been passed to exclude all the witnesses from the Court room during the progress of the trial. Evans, not knowing of the order, came into the Court room, and was present during a part of the trial. And on this account, it was moved by the Solicitor General, that his testimony should be excluded. But the Court refused the motion, repeating the same remark which fell from the Court in relation to Miss Barker, namely: that it was a fact which might go to his credit.

If there be any sense in the rule which allows witnesses to be removed out of hearing, while the rest are testifying, then Mr. Evans, however unintentional on his part, placed himself in a situation to cause the force of his testimony necessarily to be impaired.

[4.] I would remark, that the Civil Law is a system which abounds in restrictions upon the admission of testimony. It extended its prohibition to relations; parents and children; servants and domestics; freedmen and clients; advocates, attorneys, tutors, curators; persons who had criminal prosecutions with either party; and those, who by eating or drinking with the party, had thrown themselves open to the suspicion of subornation. Still, great discretion was given to the Judge, both in admitting and excluding testimony, and in judging of its weight.

[5.] And formerly in England, whole juries were composed of rude and illiterate men—a system of excluding testimony grew up, more technical and artificial than any to be found in the world.

[6.] But as jurors have become more capable of exercising their functions intelligently, the Judges both in England and in this country, are struggling constantly to open the door wide as possible: *aye, to take it off the hinges,* to let in all facts calculated to affect the minds of the jury in arriving at a correct

conclusion.   Hence, so many modern exceptions to ancient rules of evidence; so many chapters and notes, where the exceptions cover much broader ground than the rule itself.

[7.] By Lord Denman's Act, which received the Royal approbation some ten years ago, the objection of incompetency, as far as interest and infamy go, is abolished in Great Britain. Indeed, by a Statute of the late Parliament, even husbands and wives may testify for and against each other, except in certain excepted cases.   And in this respect, the mother country is in advance of her children, though hitherto in legal reforms, they have taken the lead of her.   But she has stopped infinitely short of the true point.

[8.] Truth, common sense, and enlightened reason, alike demand the abolition of all those artificial rules which shut out any fact from the jury, however remotely relevant, or from whatever source derived, which would assist them in coming to a satisfactory verdict.

[9.] It is alleged as error, that the Court excluded the defendant's witnesses from the Court room, during the progress of the trial.   At the instance of the defendant's counsel, the State's witnesses were subjected to this restraint.   And we see no good reason, why any discrimination should be made in the matter.   Indeed, the rule in such case, is the very reverse of what is assumed in the argument.   "Before the examination commences", says Mr. Chitty, "the *Crown* may *demand* that the witnesses should retire, in order to each being questioned in the absence of the others.   And the same order will be made on the request of the defendant, *but as matter of indulgence, and not of right.*"   1 *Chitty's Cr. L.*, 618 : *citing Foster*, 47, *Bac. Abr. Ev. D.; Williams, J., Ev.* 4 ; 4 *Herg. St. Tr.* 754 ; *Ib.* 800; *Peake, Ev.* 206, *n. f.*

[10.] Exception was taken to the charge of the Court, to this effect : " That if one witness of equal knowledge and credibility swears positively to a fact, and fifty swear negatively, that they did not see or know the fact, the one witness swearing positively, and not contradicted, is to be believed in preference to the fifty."

The charge is here as an abstract proposition, and still more so as applicable to the facts of this case. Miss Stallings had testified that the interview between Johnson and herself, took place near a certain road, and as she supposed, between the hours of eight and ten o'clock in the morning. Mr. Evans swore, that he was at work on the road in cutting and hewing timber, from seven in the forenoon, till two in the afternoon; and that he neither saw Miss Stallings nor Mr. Johnson on that day. And yet Johnson's witnesses prove, that he left home after early breakfast that morning, and did travel that identical road in going to his plantation. He has never denied the fact. It is equally certain that Miss Stallings passed along that road the same morning in returning home from her brother-in-law's. And yet, Mr. Evans not only failed to see them together, but to see either of the parties.

One of two things is inevitable—either Mr. Evans is mistaken as to his being so near the road, or that he must necessarily have observed any one passing; or what is more probable, the meeting was before he reached his work, and earlier in the morning than Miss Stallings *guessed* it to be. For her testimony could be nothing more than conjecture, as to the time, having no watch or any other means of fixing the fact. A mistake of an hour in this regard, would create no contradiction in the evidence, nor tend in the least to impeach the veracity of either of the witnesses.

[11.] The defendant's counsel requested the Court to charge the jury, that if at any time during the transaction, the female acquiesced in the attempt, it ceased to be a rape, and the defendant could not be convicted. This instruction the Court refused to give, but stated to the jury, " That it was not necessary to give such a charge in this case, if they believed the testimony of Susan Stallings to be true; as there was no evidence except circumstantial, which was not to be believed in preference to the reliable testimony of a credible witness, of acquiescence or consent, on the part of the young lady; unless circumstantial evidence was to overrule positive testimony; of which the jury will judge, as also from the circumstances, whether

the evidence was true; and if not, whether she consented or not; if she did at first, and afterwards resisted; or if refusing at first, she afterwards ceased to resist, the jury would judge of the motive of her ceasing; if with a view to participate in the gratification, the defendant could not be found guilty : but if because she found resistance useless or from fright, it would still be forcible and against her will, and he would be guilty."

The Court might well have declined giving the charge as asked, on the ground that there was no evidence to warrant it. There is in the proof no fact or circumstance which evinces any change of mind in the girl. She either consented or resisted throughout. She is the only witness as to the transaction.— The whole question depends upon the credit which is to be given to her. But whether she is to be believed or not, I repeat, that there is no foundation for the charge, as requested, and as finally given by the Court, in the latter part of the instructions, which I have quoted. That is, that the girl at first resisted, and at last yielded voluntarily; or at first, was taken by her consent, and afterwards forced against her will. If there is any thing in the evidence, the attempted connection was with or against her consent from the time the parties met in the road, until the accuser left the accused, and fled to her home.

Instead of asking the charge which they did, the defendant's counsel, from the view which they take of the case, should rather have requested the Court to have instructed the jury that the resistance of the girl was so irresolute and undecided, and that she made such feeble fight as was calculated to encourage, rather than repel the attack. That although she never said " yes" even when the money was jingled at her—nay more—although she constantly said " no," and kept up a decent show of resistance, from the beginning to the end, that still she more than half consented to the ravishment.

We are free to say, that the charge, as given, cannot receive our sanction. It is so involved, that it requires much pains-taking to understand it; and we cannot but feel the most painful apprehension that the jury were misled by it, and their attention drawn off from the true point in controversy. And I

Jeptha V. Johnson *vs.* The State of Georgia.

would here remark, that counsel are not without fault in this matter. If counsel have reason to fear that the jury do not understand the directions given to them, it is their duty to suggest it at the time, in order that the Judge may be more explicit. (12 *Pick. Rep.* 172.)

Admitting then, that this portion of the charge was justly obnoxious to the objection which I have stated, should we send this case back for another trial? After the most anxious consideration, our determination is, to let the verdict stand. Had there been any thing like an equipoise of testimony—much more—had the preponderance been in favor of the accused, we should not have hesitated a moment in awarding a new trial.

A new trial ought never to be granted, notwithstanding some mistake or even misdirection by the Judge, provided the revisioning Court is perfectly satisfied that justice has been done; and that upon the evidence, no other verdict could properly have been found. (*Jewitt vs. Lincoln*, 2 *Shep.* 116; *Reynolds vs. Magness*, 2 *Iredell*, 26; *Morton vs. Lawson*, 1 *B. Munroe* 45; *Harris vs. Doe*, 4 *Blackf.* 369; *Bolan vs. Peoples* 1 *Brenard* 109; *Ingraham vs. South Carolina In. Co.*, 3 *Brenard* 522; *Graham vs. Bradley* 5 *Humph.* 476; *Wyley vs. King Geo. Doc.* part 117; *Princeton & Kingston Turnpike Co. vs. Gubrick* 1 *Harr.* 161; *Emanuel vs. Cooke* 6 *Dana* 212; *Thomas vs. Towsner* 6 *Monroe* 52; *Henard vs. Winer* 7 *Shep.* 325; *French vs. Stanley* 8 *Shep* 512; *Freeman vs. Rankin* 8 *Shep.* 446.)

Let us advert, for a moment, to the circumstances relied on by the defendant for his exculpation.

It is assigned that the kind and color of the clothes he wore, were not accurately described by the girl.

Suppose this were true, would any slight discrepancy in this particular, invalidate the testimony of Susan Stallings, considering the circumstances under which she was placed? That these parties met on the road that morning, I have no more doubt than of my own existence. All the testimony concurs in leading to this conclusion. Now, suppose the fact of an attempted intercourse, by force, to be wholly fabricated; and that

the parties passed each other without any recognition even; or that an unsuccessful effort was made at illicit connection; and that, instead of an attempt to commit a rape by Johnson, both were guilty in truth, of a sin though of a much less odious character—would not Miss Stallings, upon either of these suppositions, have been more likely to have described the dress of Johnson correctly, than upon the hypothesis, that she was forced by him? And yet one or the other of these three hypotheses is unquestionably true. The inference, therefore, is, that no conclusion unfavorable to her veracity, is to be drawn from the misdescription of defendant's clothes.

The conflict on this point, is between Miss Barker and Susan Stallings. It is only necessary to read the testimony of each, and the result cannot be doubtful. Miss Barker admits that her brother-in-law, with whom she boarded, wore his dark overcoat the day before; it was the month of March, when cold, windy weather is prevalent: she does not testify positively that he left it off that morning, when starting *early* for his plantation, several miles off; but thinks he did, inasmuch as she had loaned him a pair of thick gloves the day before; and upon inquiring for them, he stated that she would find them in his coat pocket, which was hanging on the bed-post. She is quite sure she got her gloves that day: but is not certain whether it was in the morning or evening. To say the least of it, Miss Barker is as likely as Miss Stallings to be mistaken as to the clothes, one thing is indisputable. Miss Stallings described the prisoner with such minuteness, although she had never seen him before, that he was arrested upon suspicion: and the moment she was confronted with him, she promptly told him, to his face, that he knew he was "the nasty, stinking rascal, that did her so."

Another circumstance relied on to discredit the accuser is this: she testified that when Johnson took hold of her, he left his horse standing on the road: and when they separated, the animal was still there: whereas, it is in proof on the part of the defendant, that the animal he rode that day, was a young mare of a very restless disposition; and that she would have run off, unless fastened. But concede that the witness was wrong as

to the fact that the animal was left standing in the road—does it tend to discredit her in the least? She had walked past Johnson some distance before he dismounted. He approached her from behind, and she swears that she did not look back until he caught up and took her by the hand. He hurried her off on one side of the road, some thirty or forty steps; and as soon as he had discontinued his attempt, and she was released, she fled to her father's house, which was half a mile distant. It is not likely that she came back into the road, at the point where she left it, but reached it obliquely in the direction she was going. The animal may have been tied, and no doubt was, before Johnson overtook her. At any rate, there was nothing to direct her attention particularly to the situation of the animal. The bridle may have been thrown over a bush, at or near the edge of the road, and she not have noticed that it was confined at all. This is at most, a very small affair.

Mr. Evans' testimony was relied on to disparage the credit of the State's witness. I will not repeat what I have said on that subject.

Finally, it is proven that the wife of the defendant is a hearty, robust woman; and the inference is, that he was under no over-mastering temptation to commit this offence. This mode of reasoning, I am sorry to say, evinces but little knowledge of human nature. Man is capable of any folly or wickedness. In his primeval rectitude, as well as when renewed by grace, he is a little lower than the angels. In his fallen nature, uncontrolled by reason, he often exhibits himself an unmitigated brute. Read the appalling description of our race, when given up to the indulgence of their vile affections, as recorded by the pen of inspiration in the 26th and 27th verses of the 1st chapter of the Epistle of Paul to the Romans. And for the demonstration of its truthfulness, visit the secret chamber of the Royal Museum at Naples. Disentombed from their concealment of many centuries, you stand confronted with the visible proofs of the unnatural crimes charged upon our race, by the Apostle. But why resort to other ages or countries, for evidence in attestation of man's depravity? Our own Code

contains provisions, not only against adultery and incest, but horrible to confess, against sodomy and bestiality! and the gloomy cells of our State Prison vindicate the Code against uttering a libel on human nature.

It is insisted that the evidence showed that the girl made no great struggle to resist the attempt to violate her person. She was just fourteen years of age; of delicate constitution; and had not, as her mother swears, attained to puberty. It is a law of animal nature, that when the weaker find themselves in the power of the stronger, they become instantly paralyzed. Witness the chicken in the talons of the hawk—the beasts of the field, when seized by the lion, the monarch of the forest. Nothing unfavorable is to be deduced from the degree of resistance which was manifested. Indeed, the testimony in behalf of the prosecution is so overwhelming, that we feel that we should be trifling with the most sacred of all possessions—the inviolability of womanhood—were we to remand this cause.

Twelve months intervened from the perpetration to the trial of this offence. The accused was well informed of the proof that would be adduced to convict him; he resided in the same neighborhood with his accuser: and yet he made no attempt to impeach her character, either for truth or chastity. Her story has never varied; it carries probability and consistency upon its face. She hastened home; met her mother, pale and exhausted, upon the threshold of their humble domicil, and communicated to her parent the catastrophe that had befallen her. Why did she do this, if she participated in the act? There was no injury about her person that made it incumbent on her to account for it. There had been no detection to compel her to confess herself guilty, or to resort to the other alternative, of arraigning her paramour as a ravisher. The mother proceeds forthwith to her married daughter's, to consult what was to be done. They advise that the father, and head of the family, be notified of the matter. In company with her little son, the old lady repairs, that same afternoon, some fifteen or twenty miles, to the place where her husband was at work. They return on Sunday, and take out a warrant the next day. No offers are

Jeptha V. Johnson *vs.* The State of Georgia.

made to compromise the case, or to extort money; but they appeal directly to the law of the land for protection, and look no where else.    Shall we arrest and hold back its strong arm?

We have endeavored cautiously to scrutinize the evidence in this case, as well as to guard ourselves against those indignant feelings which are so naturally excited by the enormity of the alleged offence.    We know nothing of the parties, except what is disclosed by this record.    We are aware that there is greater danger that injustice will be done to defendants in cases of this kind, than any other prosecutions whatever.    We have all the while remembered the warning words of Lord Hale—one of the greatest and best men that ever lived, that this accusation "is easy to be made—hard to be proved—and harder to be defended by the party accused, though never so innocent"—that "upon trials of offences of this nature, the Court and jury may with so much ease be imposed upon, without great care and vigilance; the heinousness of the offence, many times transporting the judge and jury with so much indignation, that they are over-hastily carried to the conviction of the person accused thereof, by the confident testimony, sometimes, of malicious and false witnesses."

All this we have duly and deliberately pondered.    And for his family's sake, and his own, we exceedingly regret the heavy blow which impends.    But the guilty must suffer—or else there is no security for the innocent.

We are unanimous, that the judgment below should stand affirmed.