## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### BROADDUS V. COMMONWEALTH.

#### November 20, 1919.

1. RAPE—*Attempt to Commit Rape—Intent.*—The intent to commit rape is an essential element of the crime of an attempt to commit rape.

2. INDICTMENT AND INFORMATION—*Intent—Allegation of Intent.*— The evil intent, being an element in every crime, must always be in some way alleged, but when in the nature of the individual case the intent is a part of the acts alleged, it need not be separately stated. In a large part of the crimes, the vicious will appears, *prima facie,* in the act itself; hence to allege simply the act makes the required *prima facie* case, and any nonconcurrence of the will therein is matter of defense.

3. INDICTMENT AND INFORMATION—*Terms of Statute.*—The statutory terms, when an indictment is on a statute, must be followed; and to the extent to which the statute defines the offense, leaving the rest, if anything, to the common law, it is ordinarily adequate to charge the defendant with all the acts within the statutory definition, without further expansion.

4. RAPE—*Attempt to Commit Rape—Sufficiency of Indictment.*—Section 3888 of the Code of 1904 provides that: "Every person who attempts to commit an offense, and in such attempt does any act towards its commission, shall * * *" etc. An indictment under this act charged that accused made an assault upon a woman and her feloniously did attempt to ravish and carnally know, against her will and by force. The indictment thus followed the statute in the use of the word "attempt," without further expansion. It charged, however, an assault, and that the "attempt" was "to ravish and carnally know" the prosecutrix "against her will and by force." This was an act in its nature evil, and an act, therefore, *"prima facie"* evil also in intent; so this intent need not be alleged," since the statute under which the indictment was found has not made the intent "affirmatively or descriptively an element of the offense."

5. INDICTMENT AND INFORMATION—*Intent—Allegation.*—Where the statute under which the indictment is found expressly makes the "intent" descriptive of the offense, the prevailing rule is

that the indictment must expressly allege the "intent," but this is not true of section 3888 of the Code of 1904, on attempts to commit crime.

6. RAPE—*Attempt to Commit—Sufficiency of Indictment.*—An indictment charged that accused violently and feloniously made an assault upon prosecutrix, and her, the prosecutrix, did attempt to ravish and carnally know, against her will and by force.

   *Held:* That the indictment sufficiently charged the acts done towards the commission of the offense.

7. RAPE—*Attempt to Commit—Sufficiency of Evidence of Intent.*— Where the purpose of the accused to have carnal intercourse with the prosecutrix appeared from his own testimony, and his employment of force to accomplish that purpose was sworn to by the prosecutrix, and by her brother, in corroboration of her testimony, there was sufficient evidence before the jury to support their verdict in finding the existence of a felonious intent on the part of the accused.

8. WITNESSES—*Credibility—Question of Law or Fact.*—The credibility of witnesses is solely with the jury.

9. RAPE—*Attempt to Commit Rape—Evidence—Solicitation or Force.*—In the instant case, it appeared from the evidence that there was solicitation, but when that failed to accomplish the purpose of the accused, there was, according to the evidence for the Commonwealth, both threats and violence on the part of the accused used in his attempt to overcome the will of the prosecutrix, which distinguishes it from those cases in which there was only solicitation and no force.

10. RAPE—*Attempt to Commit Rape—Outcry—Complaint.*—The failure to make outcry in prosecutions for rape, or attempt to commit rape, is a fact tending to disprove the good faith of the charge, but raises no presumption of law that the prosecutrix has sworn falsely; it is a circumstance to be weighed by the jury. And in the instant case, the failure of the prosecutrix to make an outcry at the time of the alleged offense, and her failure to make complaint until the return home of her mother and father the afternoon of the day of the alleged offense, loses its usual significance in view of the fact that, according to the testimony for the Commonwealth, the threat of the prosecutrix to make outcry caused the accused to release her, and she gave a satisfactory explanation as to why she no sooner made complaint.

Error to a judgment of the Circuit Court of Page county.

*Affirmed.*

In this case the accused was convicted of an attempt to commit rape under an indictment, which, omitting its formal beginning, is as follows:

"* * * John Broaddus heretofore, to-wit, on the 2nd day of November, 1918, in the said county, with force and arms, in and upon one Nellie Richards, a female of the age of eighteen years, violently and feloniously did make an assault and her, the said Nellie Richards, feloniously did attempt to ravish and carnally know against her will and by force against the peace and dignity of the Commonwealth."

Upon considering the evidence under the statutory rule on the subject the material facts bearing upon the issues in the case as shown by the record are as follows:

The prosecutrix is a white girl, who was eighteen years of age at the time of the alleged offense, resided at her father's home in the country about four miles from Luray, and had never seen the accused, who is a colored man, until Thursday, the 31st of October, 1918, when he came to her father's house, saying that he wanted to buy some scions of the father, who was a fruit tree agent; that the father was not at home at the time and the mother of prosecutrix so told the accused and the latter stated that he would return on Friday or Saturday, next following, being the 1st or 2nd of November; but the mother then told him that neither she nor the father would be at home on either of those days and suggested that the accused come back on Sunday, November 3rd, and added that on Saturday, November 2nd, she, the mother, and the father had to go to Luray to fill out the questionnaire of the father; that accused left stating that he would return on Sunday; that while at the home aforesaid, on Thursday, the accused said something about a wrist watch he wanted to sell, and he showed the mother and some of the children present at the time a little bracelet watch with no bracelet to it;

that the accused did not show the watch to the prosecutrix or talk to her concerning it on that occasion, and the mother told the accused that she did not want to buy a watch, that the accused told the mother and the prosecutrix that he had a ring at home but did not have it with him, but would bring it when he came the next time.

According to the testimony of the accused, which is not controverted by any other testimony in the case, he had an arrangement with a jeweler in Pittsburgh by which he could sell watches and rings and receive a premium on each sale made; and also, according to the testimony of the accused, on Saturday morning, November 2nd, the father of the accused wanted some hog feed, and the accused asked and obtained permission of his father to use the horse and buggy of the latter to go to the home of Mr. Richards, the father of the prosecutrix, for the purpose, as testified by the accused, of purchasing the scions of Mr. Richards and of coming back by the mill and bringing the hog feed. The accused admits that he had been told on Thursday, as aforesaid, that Mr. Richards would not then be at home, as both he and his wife had to go to Luray as aforesaid, but he explained his going to Mr. Richard's home that day for the purpose claimed by stating that he went by Luray and took the road from Luray to Mr. Richard's home upon which he would naturally expect to meet Mr. Richards in his coming to Luray; that on not meeting Mr. Richards he went on to his home; but he does not explain why he did not wait at Luray to see Mr. Richards there or why he did not meet Mr. Richards on the way.

On Saturday morning, November 2nd, Mr. Richards and his wife left home about 9:30 o'clock for Luray for the purpose above mentioned, and were away from home until about 6:00 o'clock that afternoon, when they returned. They left at home the prosecutrix and six younger children, Claude, aged ten, and five others of the ages of eight, six,

three and two years, and the youngest of thirteen months. The house consisted of five rooms, a large sitting room and kitchen down stairs, with a door between them and another door which was the entrance door from the front of the dwelling. That about 9:00 o'clock of the morning of the Saturday mentioned the accused came, while the prosecutrix and the six younger children were sitting in the large room downstairs. That it was a cold day and there was a fire in the large room aforesaid when the accused came. That the entrance door of this room was shut and the curtains down but the blinds were not shut. That Claude, the ten-year-old brother of the prosecutrix, looked out of a window and saw the accused as he drove up to the house in the buggy aforesaid and went outdoors to meet him, did meet him, returned with the accused to the house, opened the entrance door aforesaid and the accused came on in along with Claude. That the accused shut the door behind himself and Claude and took a seat by the fire, where the prosecutrix and the children aforesaid were sitting. That the accused showed the prosecutrix the wrist watch above mentioned, which he said cost $23.00 and which he said he wanted to sell her, and stated he would let the prosecutrix have it cheaper than that price. That the accused asked Claude to get him a tar rope, which Claude got, but the accused told him that that would not do and asked Claude to get a twine string, which he did, and the accused then said that that would not do, and that the prosecutrix then herself got him a thread. That the accused then said that he wanted to measure the arm of the prosecutrix for a wrist watch and her finger for a ring; that the accused had a ring in his pocket which he showed her. That the accused measured the finger of the prosecutrix and tried to measure her wrist. That she refused to let the accused measure her wrist, and told him that she was unable to buy the watch. That the accused offered to give her the

watch and then offered to give her the watch and the ring, "if she would go in the other room with him." That she told him that she was "not going." That thereupon the accused said, "You will go or I will kill you." That the accused then first took hold of the arm of the prosecutrix and then caught her around the waist and pulled her off the chair or bench on which she was at that time sitting, lifting her up and started with her towards the door entering the kitchen, saying that he would take her into that room if he had to carry her, at the same time getting out his knife and saying he would "kill them all," or "had a notion to kill all of them." That the accused had not turned her loose when he got out the knife. That thereupon the prosecutrix threatened to call her uncle (who lived about 130 yards away, his being the nearest resident to the Richards home). That when the prosecutrix threatened to call her uncle she succeeded in jerking away from the accused. That the "only way" the prosecutrix "got rid of the accused was by telling him that she was going to call her uncle"—that "the accused then let her go." That the accused staid in the room "a little while longer and then grabbed his hat and ran." That "when he left he asked (the prosecutrix) not to tell her father what had happened." That when he got to the door he told Claude that he "had better go with him" and asked Claude to go with him to Simon Foster's (who lived some 150 to 200 yards away from and in sight of the Richards home); "to help him sell a watch to Foster's wife and daughter." That the accused said that "if he did not make a deal at Simon Foster's there would be bloodshed." That Claude went with the accused up to Foster's fence. That after some time the accused came back down by the Richards' home and "hollered in at the window and requested Nellie (the prosecutrix) and the others not to tell their father what had happened."

That the posecutrix was not hurt, and "did not scream or hollow nor did the children scream, but that they were terribly scared when he (accused) * * * put his arm around her waist * * *." That the prosecutrix was excited and nervous and went upstairs and went to bed as soon as the accused left and remained there until about one o'clock when she got up to get dinner. That the reason she did not go to her uncle's home was "on account of the children and because her uncle's family had the 'flu'; that she was so frightened that she did not know what to do."

That two of prosecutrix's brothers, aged twelve and thirteen respectively, came home about twelve o'clock from cutting wood and remained the rest of the day.

That the first complaint the prosecutrix made to anyone was to her mother, which was immediately upon the entrance of the mother into the home on her return from Luray, which was on the afternoon of the day of the occurrence as aforesaid; and next to her father as he, a short while thereafter, came upon the porch.

When arrested, on being informed with what he was charged in the warrant, the accused denied that he was at the Richards' home on the Saturday aforesaid, but afterwards admitted that he was there.

The accused testified in substance, that he did ask the prosecutrix to go with him into the kitchen on the occasion upon the Saturday above mentioned, and that he did this with the purpse and intent to have carnal intercourse with her. It should, however, be also said, perhaps, although, of course, we cannot regard it as true under the rule under which we must consider the evidence, that the accused in his testimony on the trial in the court below denied that he put his arm around the waist of the prosecutrix, or that he had any knife with him, or that he at any time used or intended to use any force or to do anything contrary to the will of the prosecutrix; and he made other statements

some of which corroborated and some of which were in conflict with the evidence for the Commonwealth.

*R. S. Parks, Chas. A. Hammer* and *F. I. Dovel,* for the plaintiff in error.

*Jno. R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile,* for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The assignments of error raise the questions which will be disposed of in their order as stated below:

1st. Is the indictment insufficient in that it does not specifically charge that the assault was made "with the intent" to ravish and carnally know the prosecutrix against her will and by force?

This precise question seems not to have been expressly decided in Virginia. It is, however, in principle, free from difficulty, and, as we shall see, the question has been ruled in the negative by analogous and also by direct authority elsewhere.

[1, 2] The indictment in the case in judgment is for an "attempt" to commit rape. There is no question but that the "intent" to commit rape is an essential element of that crime. As said by Mr. Bishop, speaking of crimes which are *malum in se,* "The evil intent, being an element in every crime, must always be in some way alleged." 1 Bish. New Cr. Procedure (4th ed.), p. 325. "But," as this learned author also states, "when in the nature of the individual case it" (the intent) "is a part of the acts alleged, it need not be separately stated. * * * In a large part of the crimes, the vicious will appear *prima facie,* in the act itself;

hence to allege simply the act makes the required *prima facie* case, and any non-concurrence of the will therein is matter of defense." *Idem*, p. 325. See also to same effect, *Rex* v. *Phillips*, 6 East 464, 472; *Com.* v. *Hersey*, 2 Allen (Mass.) 173, 180.

[3] And further: As laid down by the same eminent authority, and as is well settled, "The statutory terms, when an indictment is on a statute, must be followed." 2 *Idem*, p. 45. And again: "Words of the Statute.—To the extent to which the statute defines the offense, leaving the rest, if anything, to the common law, it is ordinarily adequate * * * to charge the defendant with all the acts within the statutory definition, * * * without further expansion.' 1 *Idem*, p. 361.

[4] The indictment in the case before us was under our statute, section 3888 of the Code, which, so far as material, provides as follows:

"Every person who attempts to commit an offense and in such attempt does some act towards its commission, shall * * *," etc.

The indictment under consideration follows the statute in its use of the term "attempt," without further expansion. It charges, however, an assault, and that the "attempt" was "to ravish and carnally know" (the prosecutrix) "against her will and by force." This was an act in its nature evil and an act, therefore, *"prima facie* evil also in intent; so this intent need not be alleged," since the statute under which the indictment was found has not made the intent "affirmatively or descriptively an element of the offense." 1 Bishop on Cr. Procedure, p. 327.

In *Johnson* v. *State*, 14 Ga. 55, 59-60, in holding the indictment involved in that case sufficient, the court said: "The grand jurors, in this court, charge the prisoner with an assault with intent to commit a rape. And in the body of the count it is alleged, that with force and arms he made

an assault upon Susan Stallings, and forcibly and against her will, attempted to ravish her. It is argued that we must look to the body of the count for the character and description of the offense and that there the *attempt* is charged, and not an assault with intent to ravish.

"Is there any difference between an assault with *attempt* to ravish, and an assault with intent to ravish? We do not deny that there is a distinction between an intent and an attempt to do anything. The former implies the purpose only; the latter an actual effort to carry that purpose into execution. But the question is, whether in crimes, which require force as an element in their commission, there is any substantial difference between an assault with intent and an assault with attempt to perpetrate the offense? We think not.

"What is an assault? It is an *attempt* to commit a violent injury. Consequently, an assault with intent to commit a rape, is an *attempt*, by violence, to commit a rape. The verdict under this count was in conformity with the indictment. And we are the better satisfied with this conclusion as the Code declares that every indictment shall be sufficient which charges the offense so plainly that it may be easily understood by the jury. Under the first count, the jury must have understood that the defendant was charged with the offense of rape. And under the second, with an attempt, by violence, to commit the crime."

In *State* v. *Hager*, 50 W. Va. 370, 40 S. E. 393, the indictment was for an attempt to commit murder, and in holding the indictment sufficient without any express allegation that the acts done in the attempt to kill were done with the "intent" to murder, the court said: "* * * we grant, as claimed by counsel for the defendant, that to constitute an attempt there must be an intent to commit the act, and some act done towards its consummation of such a nature as to constitute the attempt to commit the offense.

*Clark's Case,* and *Uhl's Case,* 6 Gratt. (47 Va.), 675 and 706; 1 McClain's Crim. L., s. 228. But the authority last cited at the same time distinctly says: 'The allegation of the attempt implies the intent to do the act attempted. In fact, the allegation of attempt implies both the intent and an actual offer to consummate the intent, and therefore such an allegation has been held in itself sufficient.' It is a principle of pleading that whatever is included or necessarily implied from an express allegation, need not be otherwise averred. 'When we say that a man attempted to do a thing, we mean that he intended to do, specifically, it, and proceeded a certain way in doing it.' 1 Bishop's Crim. L., sec. 729. It was held in *Scott* v. *People,* 141 Ill. p. 204 [30 N. E. 329], that where the statute uses the word 'intent,' it is necessary to charge it, but otherwise where the statute uses the word 'attempt' only, as ours does. The indictment uses the words of the statute. That case held good an indictment charging merely an attempt, and not an intent. 'It seems impossible to doubt that the only distinction between an intent and an attempt to do a thing is that the former implies purpose only, while the later implies both the purpose and an actual effort to carry that purpose into execution.' Hughes Crim. L. & Prac., s. 2751. This doctrine is sustained in numerous cases. *Jackson* v. *State,* 91 Ala. 55 [8 So. 773, 24 Am. St. Rep. 860]; *Prince* v. *State,* 35 Ala. 367; *Johnson* v. *State,* 14 Ga. 55. An indictment charging that the defendant 'unlawfully, feloniously, after premeditation, deliberation and of his malice aforethought, did attempt to shoot, kill and murder,' was held good, the court saying that 'an attempt to kill necessarily implies an intent to kill.' *Felker* v. *State,* 54 Ark. 489 [16 S. W. 663]. Other cases might be cited. So the indictment is good."

In *Atkinson* v. *State,* 34 Tex. Cr. Rep. 424, 428, 30 S. W. 1064, the indictment charged an assault and an "attempt"

by force to commit robbery. In holding the indictment sufficient notwithstanding its omission of an express allegation of the "intent" to commit robbery, the court said: "Appellant assigns as error the refusal of the court to quash the indictment in this case, and also the refusal of the court to arrest the judgment, which involves the validity of the indictment to charge the offense. The indictment charges that the appellant 'did make an assault,' etc., 'upon one S. D. Knox, and, by putting him in fear of life and bodily injury, did attempt to fradulently take from the person and possession of the said S. D. Knox certain personal property,' etc. The appellant insists that the indictment should have charged that the assault was made with the intent to rob and that the use of the word 'attempt' does not convey the same meaning, and vitiates the indictment. Webster defines an 'attempt' as follows: 'To make trial or experiment of; to try; to endeavor.' In 1 American and English Encyclopaedia of Law, p. 936, it is defined as 'an effort or endeavor; an act tending towards the accomplishment of a purpose which exceeds a mere intent or design, but, falls short of an execution of it.' Mr. Bishop (1 Criminal Procedure, section 80), says: 'It seems impossible to doubt that the only distinction between an "intent" and an "attempt" to do a thing is that the former implies the purpose only, while the latter implies both the purpose and an actual effort to carry that purpose into execution. Since, therefore, the word 'attempt' embraces the full meaning of 'intent', with something more, it is not impossible that the courts may hereafter hold it to be an admissible substitute in an indictment.' Our Penal Code, article 722, defines 'robbery' as 'a fraudulently taking from the person or possession of another any property with intent to appropriate the same to the use of the taker by means of an assault,' etc. The indictment in this case properly charges an assault, and then charges an attempt to

fraudulently take personal property from the person or possession of the assaulted party, with intent to appropriate same to the use of defendant. It is difficult to see how an assault could be made an a person, and at the same time an endeavor or effort made to fraudulently take from such person property in his possession, without such party entertaining at the time the intent to do what he was then endeavoring to accomplish; and, in our opinion, the allegation of attempt in this case, in the connection in which it is used, embraces the technical word 'intent' as used in the statute, and we accordingly hold the indictment good. *Curry* v. *State,* 4 Tex. Crim. App. 575; *Hart* v. *State,* 38 Tex. 383; *Prince* v. *State,* 35 Ala. 367; *Johnson* v. *State,* 14 Ga. 55."

To the same effect, see *Scott* v. *People,* 141 Ill. 195, 203-4-5, 30 N. E. 329; *State* v. *Daly,* 41 Or. 515-17, 70 Pac. 706; *Lewis* v. *State,* 35 Ala. 380.

[5] Where the statute under which the indictment is found expressly makes the "intent" descriptive of the offense, the prevailing rule of decision has heretofore been that the indictment must expressly allege the "intent." *State* v. *Ross,* 25 Mo. 426; *State* v. *Marshall,* 14 Ala. 411. But, as we have seen, such is not true of the statute involved in the case before us.

[6] 2. Does the indictment sufficiently charge the acts done towards the commission of the offense?

This question has been expressly decided in the affirmative in *Cunningham's Case,* 88 Va. 37, 40, 13 S. E. 309. In that case the indictment, with the exception of the names of the parties and the dates, was, in its charge of the commission of the offense, in precisely the same language as in the case in judgment. This court, in holding the indictment sufficient, said: "The indictment in this case is for an attempt to commit rape, under section 3888, *supra,* and the charge is in the words of the statute charg-

ing the attempt. The act done towards the commission of the offense—that is, not of rape, but of an attempt to commit rape—is that the defendant did, with force and arms, in and upon Martha Hartsook, then being over the age of twelve years—to-wit, of the age of fifty years—violently and feloniously made an assault, and her the said Martha Hartsook, then and there, to-wit, on the day and year aforesaid, feloniously did attempt to ravish and carnally know, against her will and by force, etc.

"The plaintiff in error complains that this indictment did not charge or aver an act done in the attempt to commit the offense, and so that he is surprised when the evidence was offered to show that, in the night-time, while the said Martha Hartsook was in bed and asleep, he, the said plaintiff in error, laid his hands upon her and declared his purpose, and, when she called for help, threatened to choke her, and seized her by the shoulders to that end, when, help arriving in response to calls, the said plaintiff in error fled. *The indictment distinctly charges the violent and felonious assault and the attempt to rape. If this be true, then an act was done by him in the attempt to commit rape. He made a violent assault, and attempted to commit rape. To charge this is to charge and aver an act done towards the commission of the offense; an assault is an act; no mere words can constitute an assault.* The demurrer to the indictment was properly overruled; there was no error in that action of the corporation court of Bristol." (Italics supplied.)

[7, 8] 3. Was there sufficient evidence before the jury to support their verdict in finding the existence of a felonious intent on the part of the accused?

The material portions of the evidence appear from the statement preceding this opinion. The purpose of the accused to have carnal intercourse with the prosecutrix appears from his own testimony. His employment of force

to accomplish that purpose is sworn to by the prosecutrix, and also by the brother, in corroboration of her testimony. Their credibility was solely with the jury. See *Glover's Case*, 86 Va. 382, 10 S. E. 420, and *Lufty's Case*, 126 Va. 714, 100 S. E. 829, in which there was less evidence to support the verdict than in the case in judgment.

[9] In *Woodson's Case*, 107 Va. 895-897, 59 S. E. 1097, 1098, strongly relied on for the accused, as this court in its opinion said, "There was no attempt to use force, no threat, only solicitation. The absence of all violence and of evidence of any intention to use force, if necessary, to overcome the will of the prosecutrix." In the case in judgment there was, it is true, solicitation, but when that failed to accomplish the purpose of the accused, there was, according to the evidence for the Commonwealth, both threats and violence on the part of the accused used in his attempt to overcome the will of the prosecutrix.

The following should also be said of the cases mentioned below which are relied on for the accused upon the question under consideration, namely:

In *Hairston's Case*, 97 Va. 754, 32 S. E. 797, there was an entire absence of any proof of the use of force by the accused.

In *Christian's Case*, 64 Va. (23 Gratt.) 954, in view of the previous unchastity of the accused, the force used was held to be consistent with the theory that the acts of the accused were but evidence of solicitation.

[10] 4. Is the failure of the prosecutrix to make an outcry at the time of the alleged offense and her failure to make complaint until the return home of her mother and father the afternoon of the day of the alleged offense, evidence *per se* of the falsehood of her testimony?

As said in *State* v. *Miller*, 191 Mo. 587, 612, 90 S. W. 767, 775 "* * * the failure of such outcry is simply a fact tending to disprove the good faith of the charge, a circum-

stance. only of more or less weight depending upon the surrounding circumstances; a failure to make it raises no presumption of law that the prosecutrix has sworn falsely; it is a circumstance to be weighed by the jury. (*State* v. *Marcks,* 140 Mo. 656, 1-c 661 and 662 [41 S. W. 973, 43 S. W. 1095].) And so, also of the delay in making complaint."

And in the instant case the failure to make outcry loses its usual significance in view of the fact that according to the testimony for the Commonwealth, the threat of the prosecutrix to make outcry caused the accused to release her and take his departure so that there was no occasion for her to make an outcry.

And with respect to the failure to sooner make complaint, the prosecutrix in her testimony enters into an explanation of that, as appears from the statement preceding this opinion, which explanation is not in the nature of things incredible, and hence the credibility of all of this was for the jury.

The case before us is widely different from *Harvey's Case,* 103 Va. 850, 49 S. E. 481, relied on for the accused, where the complaint was not made until after the birth of a child and where the testimony of the prosecutrix was uncorroborated and was in many respects incredible.

The judgment under review will, therefore, be

*Affirmed.*