STATE OF WEST VIRGINIA

*v.*

DAVID LEE HUFFMAN

(No. 10706)

Submitted April 27, 1955.     Decided May 31, 1955.

*Cleo S. Jones, John T. Copenhaver, Jr.,* for plaintiff in error.

*John G. Fox,* Attorney General, *Fred H. Caplan,* Assistant Attorney General, for defendant in error.

58

HAYMOND, JUDGE:

At the January Term, 1954, of the Intermediate Court of Kanawha County the defendant, David Lee Huffman, was indicted for a felony by the grand jury attending that court. The indictment charged that the defendant, David Lee Huffman, during the month of December, 1953, in Kanawha County "in and upon one Myrtle Lee Davis, a female person not his wife, violently and feloniously did make an assault, and her, the said Myrtle Lee Davis, then and there violently and against her will and by force unlawfully and feloniously did ravish and carnally know, against the peace and dignity of the State." The indorsement on the indictment was signed by the foreman of the grand jury and by the prosecuting attorney of Kanawha County, but it designated the defendant as David Lee Hudson.

When the defendant was arraigned for trial on February 10, 1954, during the same term of court, he moved to quash the indictment because the indorsement contained the name of David Lee Hudson. The court overruled the motion and, at the instance of the prosecuting attorney, over objection and exception of the defendant, amended the indorsement by substituting the correct name of the defendant.

A demurrer of the defendant and his motion to quash the indictment were overruled and the defendant entered his plea of not guilty. By its verdict the jury found the defendant guilty of an attempt to commit the crime of rape. The court overruled the motions of the defendant to set aside the verdict and in arrest of judgment and, by order entered February 11, 1954, sentenced the defendant to be confined in the penitentiary of this State for a term of not less than one year or more than five years.

Upon writ of error to the Circuit Court of Kanawha County that court on July 27, 1954, affirmed the judgment of the intermediate court. To the judgment of the circuit court this Court granted this writ of error and supersedeas on November 15, 1954, upon the petition of the defendant.

On the night of December 17, 1953, the defendant twice visited a restaurant at 1222 East Washington Street in Charleston, known as the Kawash Cafe, where the prosecuting witness had recently obtained employment and asked her to go with him after the restaurant closed that night. A few minutes after midnight she left the restaurant to go to her room at the DuPont Hotel. The defendant, who was waiting for her on the opposite side of the street from the restaurant, met her and they walked together to the Charleston High School, which is located west of the restaurant in the same city block. The school building fronts on Washington Street and extends through the block to Lee Street. They walked on Washington Street to Brooks Street, continued on Brooks Street to Lee Street, entered the grounds of the high school from Lee Street, and descended a ramp which extends below the level of the street. There they remained for several minutes and during that time the defendant engaged in the acts and the conduct which resulted in the indictment.

After leaving the Charleston High School they continued to walk east on Lee Street, from Lee Street to Quarrier Street, and east on Quarrier Street to the corner of Quarrier Street and Elizabeth Street near the residence of the mother of the defendant. At that point the defendant called a passing taxicab which they entered and in which they rode together to the Capitol Hotel on Summers Street in a business section of Charleston. They went in the hotel, the defendant registered them as husband and wife, and they obtained a room in which they spent the remainder of the night and stayed until ten o'clock or eleven o'clock that morning when they left the hotel and went to a nearby restaurant called the Little Drake Inn on Summers Street where they had coffee.

The prosecuting witness then left the defendant at that place, went to the hotel where she had a room, got her clothes and returned to the Little Drake Inn. There she left some of her clothes. From the Little Drake Inn she went to the Kawash Cafe, quit her employment, and told

her employer of the acts and the conduct of the defendant. Her employer advised her to inform the police and took her to the detective bureau of the city police department where she reported the matter to a city detective. Later that day the detective and another officer went to the Little Drake Inn where they got the clothes she had left there, to the Charleston High School where they found her pen, and to the Capitol Hotel where they found her brassiere. While at the detective bureau, using the name of Dorothy Jones, she signed a complaint against the defendant on which a warrant for his arrest was issued.

After the prosecuting witness left the Little Drake Inn the second time the defendant, expecting her to return to meet him, waited for her there for sometime, then left and returned about three o'clock, learned that she had not been there, left again and returned a second time about five o'clock. At that time he was informed that officers had been there and had taken her clothes. He then went to the home of his grandparents, where he learned that a warrant had been issued for his arrest, told them and his mother that he was leaving, obtained some money from them, and travelled by bus to Beckley where he was arrested about eleven o'clock that night. The following morning he was brought back to Charleston and apparently placed in jail. At the time of his arrest he was on probation in connection with a prior conviction of a misdemeanor.

As the record discloses that the acts and the conduct of the prosecuting witness and the defendant, from the time they first met on Washington Street until they got in the taxicab and from the time they entered the hotel room until they went to the Little Drake Inn later that morning, are actually known only to them, and as their testimony with respect to some of their acts and conduct is conflicting, it is necessary to relate the material facts testified to by each of them upon the trial of the indictment.

The prosecuting witness, who in December, 1953, was

an unmarried girl a few months past sixteen years of age and who a few days prior to December 17 had come from her home in Alpoca, near Mullens, Wyoming County, to Charleston, and sought and obtained employment from the proprietor of the Kawash Cafe, testified that she told her employer at the time that her name was Dorothy Jones and that she was eighteen years of age; that she did not know the defendant until he came to the restaurant on the night of December 17; that he asked her to go with him after it closed that night; that she refused his request; that when she left the restaurant about twenty minutes after midnight he followed and met her as she was walking west on her way to her hotel room; that he put his arms around her neck and said "I am going to take you home."; that she told him "he was not" and tried to get away from him at the Charleston High School; that he took her against her will to a place removed from the sidewalk, threw her down on the cement, put her left arm under her, got on top of her and, despite her resistance, inserted his male organ in her four or five times; that she told him to let her get up; that by fighting she pushed him from her each time; that he tore her brassiere and panties and caused blood stains on her slip and skirt; that she screamed; that when she finally "managed to get up" he told her "You are going with me" and she replied "No, I am not."; that her hand was scratched and there was a blue spot on one of her legs; that she saw two taxicab drivers and a police car pass; that she "hollered at" the police car but that it did not stop; that defendant called a taxicab and told her he had a gun and would shoot her and the driver if she opened her mouth; that when the taxicab stopped she entered it and he followed her; that they went in the taxicab to the Capitol Hotel; that when they left the taxicab the defendant said "We are going up here and you are going to stay all night with me. If you open your mouth, there is just one man that works behind the counter, and if you open your mouth I will shoot you and the hotel man too."; that the defendant registered while she stood at the door; that he pushed her in the room and said "I am going to shoot

you."; that she tried to leave the room but that each time she did so he prevented her from leaving; that they went to the room about three o'clock in the morning; that while they were together in the hotel room the defendant tried to have intercourse with her but that she would not let him touch her; that she did not undress; that about five thirty o'clock she cried herself to sleep and slept until about ten o'clock; that he went to sleep before she went to sleep and that he awoke before she awoke; that after they left the hotel they went to the Little Drake Inn where they drank coffee; that a girl there told her that there was blood on the back of her skirt; that she went from the Little Drake Inn to the hotel where she was staying, changed her skirt, got her clothes, returned to the Kawash Cafe before noon, quit her employment, and told her employer what had happened; and that he then took her to the city police. She also testified that the defendant took her wallet and her money in it but that she did not know how much it contained and that she did not give him money to pay for the hotel room.

On cross examination she denied that after she and the defendant left the Charleston High School the defendant showed her his mother's home or mentioned his mother, but she admitted that he said "You go into my home and stay all night with me"; that she replied "I will not."; that he also said "You can have my bedroom and I will sleep in the living room."; and that she told him that she "would not". She denied that she told Beatrice Ellis, Marie Burgess and J. W. Burgess, who testified in behalf of the defendant, that she would not have signed the warrant if her employer Kawash had not forced her to do so and denied that she told Beatrice Ellis that the defendant did not "force" her.

She also stated, on cross examination, that she had written a note to the defendant in answer to a note that he had witten to her. The note which she had written was then identified and introduced in evidence as Defendant's Exhibit No. 1. This note contained the statements, among

others, that she "was going to" sign a paper to get the defendant "out of trouble" but that she was not permitted to do so and that she did not tell her employer what had happened but that he asked her and made her go to the police. In answer to questions then asked her by the assistant prosecuting attorney she stated that she had received a note from the defendant which she identified and which was signed with the intials "D. H." and that a boy named Billy delivered it to her. The State then introduced in evidence, over objection of the defendant, two notes identified as State's Exhibit No. 3 and State's Exhibit No. 4.

State's Exhibit No. 3 is in these words: "M. D. They have me indicted for rape in the paper but if you don't swear against me I can beat them. If you swear against me I will get 20 years. Don't let me down. DH." State's Exhibit No. 4 is in this language: "If you are pregnant don't worry about that, but I don't believe you are. Anyway I will come up some time tomorrow when they send your food up and talk to you about it. You know that they will take you in the court room when they have my trial, but you don't have to say anything unless you want to. They can't make you. By the way it won't be six months, it will be sometime in February when my trial is. Don't let me down and I sure won't let you down you can depend on that. Ask May if I am good for my word or not. D. H. Send my answer back when the man comes after the pans at supper time—that don't leave you much time to write but please try to send it back then. And tomorrow I will come up, and when you see me come over to the bars."

When cross examined about one of the notes and asked if she knew where it came from she stated that she knew it was from the defendant and that the boy named Billy gave her the notes.

In testifying in rebuttal the prosecuting witness denied that she told Frances Asseff, a witness in behalf of the defendant, that the defendant did not "force" her.

The employer of the prosecuting witness testified that when she came to the restaurant she was hysterical and crying; that he asked her what the trouble was; that she told him; and that he then took her to the detective bureau.

The city detective to whom the prosecuting witness was taken by her employer and with whom she talked testified that she showed him the back of one of her hands "where she had been scratched" but that he did not examine her for marks.

After the prosecuting witness had signed the complaint against the defendant she was examined by a doctor who, as a witness in behalf of the State, testified that there was a tear of the tissue in the hymen ring in her vaginal area; that the tissue was inflamed, irritated and torn; that the cause of this condition could have occurred within the twenty four hour period; that the tear of the tissue in the hymen ring was produced by force; that the object which caused that condition could have been a penis or a finger; that either could have caused her to bleed; and that he found no sperm in the area which he examined.

City detectives recovered the trousers and the underwear worn by the defendant and the brassiere, the panties, the slip and the skirt worn by the prosecuting witness when they were together on the night of December 17. These garments were examined by the chemist of the Department of Public Safety. He testified as a witness in behalf of the State and stated that he found human blood on each of these articles of clothing and semen stains on the slip and the panties and that the panties and the brassiere were torn.

The defendant, a young man twenty two years of age at the time of the trial, testified that he resided at 1593½ Quarrier Street; that he did not know the prosecuting witness before he met her when he first came to the Kawash Cafe between eight o'clock and nine o'clock on the night of December 17; that she flirted with him; that he asked her to go out with him later that night; that she

told him she would go with him; that he returned to the restaurant and waited for her across the street until she finished her work; that he met her after she left the cafe while she was walking west on Washington Street; that they walked on Washington Street, turned left on Brooks Street, proceeded on Brooks Street to Lee Street and to an incline at the Charleston High School; that "We walked down and sat there a minute and then we sat down and I kissed the girl and petted her a little bit and tried to make her. I had one hand on her breast and I had the other hand between her legs. I was petting her with my hands. She says, 'No, don't do that, it hurts.' It took about ten minutes, I suppose, and then we left. She says 'That hurts me' and we left."; that his fingers had long nails; that he was "making a penetration of her female organs" with his fingers; that he had his "male organ out of" his pants but that he did not insert it in her. He denied that he used any force, or that he put his arm around her neck, or that he had a gun, or that he threatened her at any time, or that he held her arm behind her back. He stated that she did not scream, or make any outcry except to say "No, No, it hurts.", or talk in a loud voice; that she did not fight him or try to run, or push him from her; and that she wore all her clothes.

He further testified that after they left the Charleston High School they walked to his mother's home at 1593½ Quarrier Street and started to enter when she said "No, your mother is there."; that they decided to go to a hotel; that they stopped under a street light at the corner of Quarrier Street and Elizabeth Street, where she gave him $2.15 or $2.25 to pay for the hotel room and a taxicab, and then walked on Elizabeth Street toward Washington Street; that before they reached the corner of those streets a police car passed on Washington Street at a distance of thirty or forty feet from them; that it was followed by a taxicab; that they rode in the taxicab to a place called the Empire Diner on Summers Street; that he left her, went in the Empire Diner, borrowed fifty cents from a friend and in about five minutes returned to

meet her at a nearby place known as Playland where she had waited for him; that they then walked on Summers Street to the Capitol Hotel where he registered them as a married couple and obtained a room; that after they entered the room he went to the bathroom which was located about thirty feet from the room; that she remained in the room; that he stayed at the bathroom about five or ten minutes and returned to the room; that they then went to bed; that at that time he wore his shorts and his shirt and she wore her panties and her brassiere; that he kissed her and played with her breasts but did not attempt to have intercourse with her; that he went to sleep in about fifteen minutes and awoke about eleven o'clock that morning; that she was awake and had not dressed when he awoke; that he then went to the bathroom where he remained for about five minutes; that after he returned to the room she dressed and went to the bathroom; that after she returned to the room he went to the bathroom a second time and remained there five or ten minutes; that after he returned to the room the second time they left the hotel and went to the Little Drake Inn where he obtained one dollar from a girl named Jean; and that they went together from the Little Drake Inn to another nearby restaurant called the Coney Island where they ate breakfast and then returned to the Little Drake Inn.

After the defendant was arrested he talked to a city detective and signed a written statement which was introduced in evidence with the testimony of the detective who testified in behalf of the State. A part of his statement contains this language: "I took this girl by the arm and started walking her down the street. At Brooks St. we turned left and I walked her down Brooks to Lee and I then walked her down an incline that goes down beside the building and down to a concrete floor. There we sat down on the concrete and I tried to make time with her. I was so drunk that I can't remember all that happened but remember trying to have sex relations with this girl there. I can't remember if I tried to tear her pants off or not and can't remember if I tore any of her clothing off

or not. I remember trying to get my penis in this girl but can't recall if I did or not. I don't think I ever reached a climax but finally quit and the next thing I can recall we were standing front of my mother's apt. on Quarrier Street. I tried to get this girl to go in my mother's house but she refused and said we can't go in there for your mother's there."

The manager of the Capitol Hotel who assigned the defendant a room at the hotel at two twenty o'clock in the morning of December 18 testified in behalf of the defendant that the defendant signed a registration card in the name of Mr. and Mrs. J. D. Cole; that the price of the room was $2.04; that when the defendant registered neither he nor the prosecuting witness was nervous; that the defendant did not make any threats or use any force at that time; and that when he took them to the room she walked behind him and the defendant walked behind her.

Beatrice Ellis, the mother of the defendant, J. W. Burgess, her father, and Marie Burgess, her sister-in-law, testified that in connection with a trip which they made on December 26, 1953, from Charleston to Wyoming County, during which the prosecuting witness returned to Charleston with them, the prosecuting witness told Beatrice Ellis that she would not have signed the warrant if Kawash had not forced her to do so and that after she had signed it she was sorry. J. W. Burgess testified that he heard her say that the defendant did not force her and that the affair was as much her fault as it was his fault. Beatrice Ellis also testified that she told her that the affair was as much her fault as it was his fault and that she paid most of the hotel bill. Frances Asseff testified that the prosecuting witness said to her in discussing the case at the home of Beatrice Ellis on December 28, 1953: "They are making a mountain out of a mole hill. He is not guilty of what he is being accused of. I wouldn't have signed those papers anyway if they hadn't said they would put me in jail"; that she also said "We didn't do anything wrong."; and that she told her that the defend-

ant did not have enough money to pay for the hotel room and that "she had to give him part of the money."

Jean Tittle, a witness in behalf of the defendant, testified that the defendant and the prosecuting witness came to the Little Drake Inn, where she was employed, about ten o'clock or eleven o'clock in the morning of December 18, 1953; that the prosecuting witness left some clothes in a suit case; that the witness gave the defendant one dollar; that they then left but later returned; that the prosecuting witness was not nervous or excited; and that she and the defendant while they were there acted as if they had known each other for a long time.

Walter Mullens, a witness in behalf of the defendant, testified that between midnight and two o'clock on Friday morning two or three days before he learned of the charge against the defendant he saw the defendant in the Empire Diner; that he loaned him fifty cents; and that the defendant remained in the Empire Diner approximately five minutes.

Gussie Bishop, a witness in behalf of the defendant, testified that she was acquainted with the general reputation of the prosecuting witness in the community in which she lived; that her reputation in that community for truth and veracity was bad; and that the witness would not believe her under oath.

At the conclusion of the evidence offered by the State and after the introduction of all the evidence, the defendant separately moved the court to strike the evidence and to direct the jury to return a verdict for the defendant. The court overruled these motions. The court gave seven instructions offered by the State. The defendant offered fourteen instructions all of which in their original form or as modified by the court were given, except defendant's Instruction No. 1. This instruction, which would have directed the jury to return a verdict of not guilty, was refused.

The defendant assigns as reversible error the action

of the trial court (1) in amending the indorsement on the indictment; (2) in admitting in evidence the notes identified as State's Exhibit No. 3 and State's Exhibit No. 4; (3) in sustaining objections by the State to certain questions propounded to the prosecuting witness on cross examination; (4) in holding that the evidence showed that the prosecuting witness was not the wife of the defendant at the time of the alleged offense; (5) in giving Instructions Nos 3 and 4, offered by the State; (6) in denying the motion of the defendant, at the conclusion of the evidence offered by the State, and the motion of the defendant, after the introduction of all the evidence, to strike the evidence and to direct the jury to return a verdict for the defendant; (7) in refusing to give defendant's Instruction No.1, which would have directed the jury to find the defendant not guilty; (8) in denying the motion of the defendant to set aside the verdict of the jury and to grant defendant a new trial; and (9) in denying the motion of the defendant in arrest of judgment.

The contention of the defendant that the insertion in the indorsement on the indictment of the name of David Lee Hudson, instead of the correct name of the defendant, David Lee Huffman, vitiaties the indictment, is without merit. The indorsement on an indictment is not a substantive part of the indictment and it neither adds to nor detracts from the legal force of the averments in the charging part of the indictment. 27 Am. Jur., Indictments and Informations, Section 42; 42 C. J. S., Indictments and Informations, Section 62; *State* v. *Thacker Coal and Coke Company,* 49 W. Va. 140, 38 S. E. 539; *State* v. *Heaton,* 23 W. Va. 773; *United States* v. *Nixon,* 235 U. S. 231, 35 S. Ct. 49, 59 L. ed. 207; *Williams* v. *United States,* 168 U. S. 382, 18 S. Ct. 92, 42 L. ed. 509; *Frisbie* v. *United States,* 157 U. S. 160, 15 S. Ct. 586, 39 L. ed. 657; *State* v. *McClellan,* 155 La. 37, 98 So. 748, 31 A. L. R. 527; *Capone* v. *United States,* 7 Cir., 51 F. 2d 609, 76 A. L. R. 1534, certiorari denied, 284 U. S. 669, 52 S. Ct. 44, 76 L. ed. 566. In *State* v. *Thacker Coal*

*and Coke Company*, 49 W. Va. 140, 38 S. E. 539, this Court said "The indorsement is no part of the indictment further than as a mark of identification, * * *. It is the record of the finding as returned by the grand jury."

As the indorsement on the indictment is not a substantive part of the indictment but operates merely to identify and authenticate it, the provision of Section 10, Article 2, Chapter 62, Code, 1931, that no indictment shall be abated for any misnomer of the accused and that the court may, in case of misnomer appearing before or in the course of a trial, forthwith cause the indictment to be amended according to the fact, has no present application.

Section 1, Article 9, Chapter 62, Code, 1931, then a newly enacted statute, after prescribing a general form of indictment and stating that it shall be sufficient if the indictment is procured, found and returned in all respects as provided by law, provides that an indictment shall have legibly indorsed on its reverse side the words "State of West Virginia versus _____. Indictment for a _____ (Felony or Misdemeanor, as the case may be). _____ , Foreman of the Grand Jury. Attest: _____ , Prosecuting Attorney of _____ county, West Virginia." The form of indictment prescribed in this section indicates that the Legislature intended that the prosecuting attorney should affix his signature to an indictment; but this provision in the form of an indictment is merely directory and failure to comply with that requirement does not vitiate the indictment. *State* v. *Burnette*, 118 W. Va. 501, 190 S. E. 905.

In *State* v. *Heaton*, 23 W. Va. 773, this Court posed but did not decide the question "Is it absolutely essential that the indictment should be endorsed 'a true bill;' or if it be endorsed, that such endorsement should be signed by the foreman of the grand jury, in order that the accused may be tried on such indictment?" In *State* v. *Grove*, 61 W. Va. 697, 57 S. E. 296, this Court held that "Want of the usual memorandum on the back of an indictment, 'a true bill' signed by the foreman of the grand jury, does not

vitiate the indictment." Both these cases, however, were decided long before the enactment of the present statute in the Code of 1931; and this Court has held in *State* v. *Burnette,* 118 W. Va. 501, 190 S. E. 905, and in *State* v. *DeBoard,* 119 W. Va. 396, 194 S. E. 349, that the provision of the statute which requires the indorsement on the reverse side of an indictment to be signed by the foreman of the grand jury and attested by the prosecuting attorney is mandatory and that the failure of the prosecuting attorney to attest the indictment renders it fatally defective. The obvious purpose of this requirement of the statute is to identify and authenticate the indictment and to prevent the substitution or the use of an indictment other than the indictment actually returned by the grand jury upon which the accused should be tried. This requirement is essential to the accomplishment of the clear purpose of that provision of the statute and the provision is therefore mandatory. In *State ex rel. Thompson* v. *Fry,* 137 W. Va. 321, 71 S. E. 2d 449, discussing a mandatory statute, this Court said: "The intention of the Legislature must govern, and if that intention is to make compliance with a statute essential to the validity of the act directed to be done, the statute is mandatory. *State* v. *Simmons,* 135 W. Va. 196, 64 S. E. 2d 503; *Mears* v. *Dexter,* 86 Va. 828, 11 S. E. 538; 59 C. J., pp. 1072 to 1075."

The provision of Section 1, Article 9, Chapter 62, Code, 1931, that an indictment shall have legibly indorsed on its reverse side the name of the defendant, however, is clearly not essential to the identification and the authentication of an indictment, which must state the name of the accused; and, for that reason, that provision of the statute is not mandatory but is merely directory.

The insertion in the indorsement of the name of David Lee Hudson, instead of the name of David Lee Huffman, as the defendant to the indictment, is manifestly a clerical error. It does not prejudice any right of the defendant and does not vitiate the indictment which, on its face, correctly states the name of the defendant. Though not

a part of an indictment, the indorsement, when filed and recorded by order entered in the record book of the trial court, is a record of that court which it may amend in accordance with the facts. "A court has the inherent power to amend its records in accordance with the facts." Point 2, Syllabus, *Dwight* v. *Hazlett*, 107 W. Va. 192, 147 S. E. 877, 66 A. L. R. 102. *State* v. *Laskey*, 122 W. Va. 93, 7 S. E. 2d 439; *State* v. *Hill*, 120 W. Va. 582, 200 S. E. 587. This was done in this case during the term of court at which the indictment was found and returned and the action of the trial court in so amending the indorsement was correct and proper.

The decisions of the General Court of Virginia in *The Commonwealth* v. *Buzzard*, 5 Gratt. 694, in 1848, and in *Drake and Cochren's* case, 6 Gratt. 665, in 1849, cited and relied upon by the defendant, are not in point. In the *Buzzard* case a wrong name was inserted by mistake in an indictment for a misdemeanor but the court record and the indorsement contained the correct name of the accused. The court held that the indictment could not be amended by striking out the wrong name and inserting the name of the person intended. The importance of this holding as persuasive authority in this jurisdiction has been terminated by the provision of Section 10, Article 2, Chapter 62, Code, 1931, which authorizes the court to amend an indictment according to the fact in case of misnomer of the accused. See also *State* v. *Strayer*, 58 W. Va. 676, 52 S. E. 862. In *Drake and Cochren's* case an indictment was found against Drake and Cochren. The clerk, in recording the finding, accidentally omitted the name of Drake. The court held that the record could not be amended at a subsequent term by inserting the name of Drake by an order nunc pro tunc but that the record was sufficient to show the finding of the indictment against Cochren.

The authenticity of a letter may be proved by establishing the genuineness of the signature of the writer, but it is not essential to prove the handwriting of the author when the genuineness of the letter can be otherwise

established. 20 Am. Jur., Evidence, Section 955; 32 C. J. S., Evidence, Section 706a. Under proper facts and circumstances the authenticity or the genuineness of a letter may be established by indirect or circumstantial evidence without resort to proof of handwriting. 20 Am. Jur., Evidence, Section 955; *Maynard* v. *Bailey,* 85 W. Va. 679, 102 S. E. 480, 9 A. L. R. 981; *Fayette Liquor Company* v. *Jones,* 75 W. Va. 119, 83 S. E. 726; 9 A. L. R. 984, Ann. IIa. When the contents of a letter reveal knowledge or other trait peculiarly referable to a certain person, a sufficient foundation is laid for its admission in evidence. *Hartzell* v. *United States,* 8 Cir., 72 F. 2d 569. See also Wigmore on Evidence, Third Edition, Section 2148; *People* v. *Dunbar Contracting Company,* 215 N. Y. 416, 109 N. E. 554; *State* v. *Freshwater,* 30 Utah 442, 85 P. 447, 116 Am. St. Rep. 853. When the contents of a letter are of such nature that the letter could not have passed between any parties except the purported writer and the person to whom it was delivered, the letter is admissible in evidence under the rule that the authenticity or the genuineness of an original letter must be established by proof of the handwriting of the author or by other proof of its genuineness. *Williamson* v. *Davis,* 74 Okla. 174, 177 P. 567. A letter not in the handwriting of the alleged sender, or not shown to be in his handwriting, may contain internal evidence of the source from which it came when it relates to matters which are known only to the alleged sender and, in such instance, is admissible in evidence. 32 C. J. S., Evidence, Section 706a; *State ex rel. Kunz* v. *Woodmansee,* 156 Or. 607, 69 P. 2d 298; *Commonwealth* v. *Bassi,* 284 Pa. 81, 130 A. 311. In *People* v. *Adams,* 162 Mich. 371, 127 N. W. 354, letters and telegrams purporting to come from the defendant to a witness and referring to a subject previously discussed by them, were held to be admissible without other proof to show that the defendant signed or sent them. In *Lundgren* v. *Union Indemnity Company,* 171 Minn. 122, 213 N. W. 553, 52 A. L. R. 580, in considering the admissibility of a telegram, the court used this language: "It is difficult, if not impossible, to formu-

late a standard of admissibility at once definite and dependable. But it occurs to us that any relevant writing may be admitted when from its contents and other circumstances in evidence it is reasonably inferable that the author is the person sought to be charged or another lawfully acting for him. 'Evidence which, if uncontradicted, would satisfy a reasonable mind' is sufficient. 22 C. J. 901." In *Ashlock* v. *Commonwealth*, 108 Va. 877, 61 S. E. 752, though holding inadmissible the letter questioned in that case, the court approved the proposition that a letter not shown to be in the handwriting of the person to be affected by it may sometimes be examined for internal evidence of the source from which it came and that such internal evidence may be sufficient to render the letter admissible in evidence. A headnote to the case of *In re Deep River National Bank,* as reported in 73 Conn. 341, is in these words: *"Prima facia* proof of the authenticity of letters is all that is required to render them admissible in evidence."

The notes identified as State's Exhibit No. 3 and State's Exhibit No. 4 were apparently written while the defendant and the prosecuting witness were temporarily incarcerated in different parts of the same jail in Kanawha County of which it seems the unknown boy named Billy was also an inmate. Both notes bear the initials "D. H." which are the initials of the Christian name and the surname of the defendant. One of the notes begins with the initials "M. D." which are the initials of the Christian name and the surname of the prosecuting witness. The notes were evidently written shortly after the defendant and the prosecuting witness were placed in jail and at that time some of the information contained in them such as the possibility that the prosecuting witness would not testify against the defendant concerning his conduct with her was known only to the defendant and the prosecuting witness. Some of the statements in the note designated State's Exhibit No. 4 indicate that the defendant and the prosecuting witness were in separate parts of the jail when that note was written. The

notes refer to the charge against the defendant but they do not contain any admission of his guilt. In the situation with which the defendant was confronted it was natural that he should urge the prosecuting witness not to press the charge against him and this is the obvious purpose and desire of the writer of the notes. In testifying the defendant was not interrogated about the notes and he did not mention them, or explain their authorship, or deny that he was the writer of either of them.

The evidence supplied by the contents of the notes, the circumstances under which they were written and delivered to the prosecuting witness, her statements that she knew that one of them came from him, that he sent some notes to her which she had destroyed, and that the note which she wrote to him, introduced in evidence, on her cross examination, as Defendant's Exhibit No. 1, was an answer to a letter from him, sufficiently established his authorship of the notes and in the absence of any evidence to the contrary rendered them admissible in evidence.

When it appears that two notes were received by the prosecuting witness purporting to have been written by the defendant, one of which the prosecuting witness testified she knew was from him, one of which began with the initials of her Christian name and surname and referred to a charge of rape which she had recently made against him, the actual facts concerning which were exclusively within their knowledge, the other of which contained statements which indicate that it was written while they were confined in different parts of the same jail and requested an answer from her, and both of which, urging her not to testify against him, were signed with the initials of the Christian name and the surname of the defendant and were written and delivered to the prosecuting witness within a short time after she had made the charge against him, the identity of the defendant, as the writer of the notes, is sufficiently established to render them admissible in evidence, at the instance of

the State, upon the trial of an indictment against the defendant for the offense mentioned in one of the notes.

Whether the authenticity of a letter is sufficiently established to render it admissible in evidence is a matter largely within the discretion of the trial court. 32 C. J. S., Evidence, Section 706a; *State ex rel. Kunz* v. *Woodmansee,* 156 Or. 607, 69 P. 2d 298; *Lundgren* v. *Union Indemnity Company,* 171 Minn. 122, 213 N. W. 553, 52 A. L. R. 580. The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion. *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410.

The defendant contends that the trial court erred in refusing to permit the prosecuting witness, upon objection by the State, to answer questions propounded during her cross examination by an attorney for the defendant. This contention relates to two questions and is not well founded. One of the unanswered questions which referred to the action of her employer in taking her to police headquarters was: "Didn't he tell you he was going to take you down there?" The question immediately preceding the unanswered question was "Then he said he would take you down to police headquarters?" to which she made this reply: "He asked me if I wanted to go and I said, yes." The other question to which objection was sustained related to the conduct of the defendant while he and the prosecuting witness were in the hotel room. That question was: "Could he have been asleep while you were awake?" She was previously asked on cross examination: "He could have been asleep there?" and she had answered "Yes sir; I was." She had also stated in answer to another prior question on cross examination: "He went to sleep before I did and waked up before I did." The answers sought by the unanswered questions would have been mere repetition of her previous statements. For this reason the trial court was justified in refusing to permit the questions to be

answered and its action in sustaining the objections to them was not prejudicial to the defendant.

There is also no merit in the contention of the defendant that the State failed to prove that the prosecuting witness was not the wife of the defendant at the time of the alleged offense. The prosecuting witness and the defendant both testified that each did not know the other until they met at the Kawash Cafe during the evening of December 17, and she testified that she was not married to him at the time of the trial. This evidence was sufficient to show that she was not his wife when they were together that night and the following morning.

The defendant complains of the action of the trial court in giving Instruction No. 3 and Instruction No. 4 offered by the State.

Instruction No. 3 specified various forms of verdict which the jury might return under the law and the evidence. One of the forms of verdict which the jury was informed it might return was a verdict finding the defendant guilty of the crime of attempted rape. The instruction also told the jury the punishment to be imposed in the event the jury should return any of the verdicts of guilty mentioned in the instruction. This instruction correctly stated the law and was supported by evidence introduced in behalf of the State. On an indictment charging the defendant with the commission of the crime of rape he may be convicted of an attempt to commit the crime of rape if the evidence is sufficient to warrant a conviction of the crime of rape, even though the evidence does not establish an ineffectual attempt to commit the crime of rape. *State* v. *Collins,* 108 W. Va. 98, 150 S. E. 369. See also *Glover* v. *Commonwealth,* 86 Va. 382, 10 S. E. 420.

Instruction No. 4 defined the crime of rape and told the jury that if it believed from the evidence beyond reasonable doubt that the defendant committed the acts relied upon by the State to show that the defendant with

force and violence and against the will of the prosecuting witness forced her to have sexual intercouse with him, the jury should find him guilty of rape as charged in the indictment. This instruction also correctly stated the law applicable to the crime of rape and was based upon evidence introduced in behalf of the State.

The action of the trial court in giving the foregoing instructions did not constitute error.

The remaining assignments of error, except the assignment relating to the denial of the motion of the defendant in arrest of judgment, challenge the sufficiency of the evidence to sustain the verdict of the jury which found the defendant guilty of an attempt to commit the crime of rape.

Both the prosecuting witness and the defendant testified that they did not have sexual intercourse when they were together at the hotel. The evidence, however, shows clearly that the defendant intended to have sexual intercourse with the prosecuting witness when they descended the ramp on the grounds of the Charleston High School and that he either had sexual intercourse with her, or attempted to do so, while they were together there. Those elements of the crime of rape or an attempt to commit the crime of rape are sufficiently established beyond a reasonable doubt. The written statement of the defendant was that he attempted to have sexual intercourse with the prosecuting witness but that he did not remember whether he had succeeded in penetrating her sex organs. The tear of the tissue of her hymenal ring and the condition of her clothes show that he had, or attempted to have, sexual intercourse with her. The evidence, however, fails to show beyond a reasonable doubt that the act of the defendant, in having sexual intercourse, or attempting to have sexual intercourse, with her was committed with force and violence and against her will and consent.

At common law as well as by statute, Section 15, Article 6, Chapter 61, Code, 1931, the crime of rape is carnal

knowledge, forcibly and against her will, of a female person, not his wife, by a male person who is capable of performing such act. By the statute the carnal knowledge by a male person who is over sixteen years of age of a female person, not his wife, under that age is likewise the crime of rape. *State* v. *Schilansky,* 105 W. Va. 549, 143 S. E. 307; *State* v. *Fudge,* 96 W. Va. 109, 122 S. E. 519; *State* v. *Tippens,* 91 W. Va. 504, 113 S. E. 751. The essential elements of the common law crime of rape are unlawful carnal knowledge of a woman, not his wife, by a male with force and against her will; and each of these elements must be present in order to constitute that offense. Burdick, The Law of Crime, Volume 2, Section 475. The nonconsent of the woman is a vital element of the crime of rape and if she consents to the act of sexual intercourse, unless she is under the legal age of consent, the crime is not committed. *State* v. *Hull,* 45 W. Va. 767, 32 S. E. 340; *Mingo* v. *Commonwealth,* 85 Va. 638, 8 S. E. 474; Burdick, The Law of Crime, Volume 2, Section 484.

Two elements are essential to an attempt to commit the crime of rape. These elements are a specific intent to commit the crime of rape and some overt act to accomplish it which falls short of accomplishment. Burdick, The Law of Crime, Volume 2, Section 490; *State* v. *Gill,* 101 W. Va. 242, 132 S. E. 490; *Broaddus* v. *Commonwealth,* 126 Va. 733, 101 S. E. 321; *Lufty* v. *Commonwealth,* 126 Va. 707, 100 S. E. 829; *Cunningham* v. *Commonwealth,* 88 Va. 37, 13 S. E. 309; *Glover* v. *Commonwealth,* 86 Va. 382, 10 S. E. 420; *Christian* v. *Commonwealth,* 23 Gratt. 954; *Commonwealth* v. *Fields,* 4 Leigh 648; *People* v. *Dowell,* 136 Mich. 306, 99 N. W. 23; *Clinkscales* v. *State,* 46 Okla. Cr. Ct. 29, 288 P. 348; *Payne* v. *Commonwealth,* 33 Ky. Law Rep. 229, 110 S.W. 311; *State* v. *Montgomery,* 63 Mo. 296. To sustain a conviction for an attempt to commit the crime of rape the proof must establish the specific intent to commit the crime of rape, and force, or attempted force, or an intention to use force, by the offender, in the perpetration of the offense,

necessary to overcome the will of the victim, together
with an attempt to accomplish his lustful desire against
the will of the female and notwithstanding her resistance.
*State* v. *Gill,* 101 W. Va. 242, 132 S. E. 490; *Woodson* v.
*Commonwealth,* 107 Va. 895, 59 S. E. 1097; *Hairston* v.
*Commonwealth,* 97 Va. 754, 32 S. E. 797; *Mingo* v. *Com-
monwealth,* 85 Va. 638, 8 S. E. 474; *Commonwealth* v.
*Fields,* 4 Leigh 648; *Payne* v. *Commonwealth,* 33 Ky. L.
229, 110 S. W. 311. Force is an essential element of rape
and specific intent in an attempt to commit the crime of
rape embraces every element of the crime of rape except
its accomplishment. Burdick, The Law of Crime, Volume
2, Section 490; *Hall* v. *State,* 67 Okla. Cr. Ct. 330, 93 P.
2d 1107.

The evidence shows that the prosecuting witness had
the opportunity to make an outcry and to escape from
the defendant both before and after they were together
at the Charleston High School. She could have made an
outcry and resisted him when they were walking together
on Washington, Brooks and Lee Streets before they de-
scended the ramp; but she does not testify that she did
either of these things. Though she said that he took her
to the high school against her will she did not say that he
then threatened her or compelled her to go there. After
they left the high school and walked for some distance on
Lee Street and Quarrier Street she could have made an
outcry and attempted to escape from him but she did not
say that she did either. When they came near his
mother's home which he said he asked her to enter and
to spend the night there and which he said she refused
to do, although she admitted that he asked her to spend
the night at his home, she could have reported his con-
duct to his mother and ended their exclusive association
together. She could have escaped from the defendant
and reported his conduct to the driver of the taxicab
while the defendant was in the Empire Diner where a
witness testified the defendant remained for approximate-
ly five minutes and borrowed fifty cents from the witness.
She could also have left the defendant after they went to

the hotel room when, according to her testimony, he went to sleep before she did. She could have escaped from him when they left the hotel together and went to the Little Drake Inn where, according to the testimony of a witness who saw them there, she was not nervous and where they appeared to her to be friendly. When she left him at the Little Drake Inn and went to her hotel to get her clothes she could have failed to return to him at the Little Drake Inn and could have reported his conduct to the police. Instead she did not report or complain of the conduct of the defendant until sometime later when she returned to the Kawash Cafe and was questioned by her employer. Her testimony that the defendant told her he had a gun, which he denied, is the only evidence of that fact. She did not say that she saw any weapon and no witness who observed the defendant at any time while they were together testified that the defendant engaged in any conduct which indicated that he was armed with a weapon.

Several witnesses testified that she later made statements to the effect that the defendant did not force her to submit to his acts, that she did not resist him, and that she consented to his conduct. Though she denied that she made such statements the testimony of these witnesses is that she told them or stated in their presence that she was forced to sign the complaint against him, that he did not use force against her, that she was sorry that she had made the complaint, that the defendant was not guilty of the charge against him, that the affair was as much her fault as it was his fault, that they had committed no wrong, and that she gave him money to pay for the hotel room.

All these acts and omissions of the prosecuting witness indicate strongly that she was willing to be with him from the time he met her near the Kawash Cafe and to remain with him throughout the night and until she finally left him at the Little Drake Inn, and create a reasonable doubt as to whether she consented to the act of the defendant in having, or attempting to have, sexual intercourse with her.

In a criminal case the guilt of the defendant must be established by competent evidence beyond a reasonable doubt. The burden rests upon the State to prove the guilt of a person accused of a crime not merely by a preponderance of the evidence but by evidence sufficient to establish the guilt of the accused beyond a reasonable doubt. *State* v. *Hudson,* 128 W. Va. 655, 37 S. E. 2d 553, 163 A. L. R. 1265; *State* v. *Howard,* 137 W. Va. 519, 73 S. E. 2d 18; *State* v. *Tabet,* 136 W. Va. 239, 67 S. E. 2d 326; *State* v. *Scurlock,* 99 W. Va. 629, 130 S. E. 263; *State* v. *Roush,* 95 W. Va. 132, 120 S. E. 304; *State* v. *Murphy,* 93 W. Va. 477, 117 S. E. 147; *State* v. *McHenry,* 93 W. Va. 396, 117 S. E. 143; *State* v. *Parsons,* 39 W. Va. 464, 19 S. E. 876.

As the evidence does not show beyond a reasonable doubt that the prosecuting witness did not consent to the act of the defendant in having, or attempting to have, sexual intercourse with her, the requirement of proof of the guilt of the defendant beyond a reasonable doubt has not been met or satisfied in this case, and the verdict of the jury, being without sufficient evidence to support it, should have been set aside by the trial court. In a criminal case a verdict of guilty which is without sufficient evidence to support it will be set aside by the appellate court. *State* v. *Comstock,* 137 W. Va. 152, 70 S. E. 2d 648; *State* v. *Hudson,* 128 W. Va. 655, 37 S. E. 2d 553, 163 A. L. R. 1265; *State* v. *Hurst,* 93 W. Va. 222, 116 S. E. 248; *State* v. *Chafin,* 78 W. Va. 140, 88 S. E. 657; *State* v. *White,* 66 W. Va. 45, 66 S. E. 20; *State* v. *Miller,* 42 W. Va. 215, 24 S. E. 882; *State* v. *Zeigler,* 40 W. Va. 593, 21 S. E. 763; *State* v. *Foster,* 21 W. Va. 767. The action of the trial court in refusing to direct a verdict of not guilty and, after the jury returned a verdict of guilty, in denying the motion of the defendant to set aside the verdict and award him a new trial, constituted reversible error.

As the indictment is sufficient on demurrer and motion to quash and as no vitiating error appears on the face of the record, the motion of the defendant in arrest of judgment was properly overruled. A motion in arrest of

judgment lies only for some error appearing on the face of the record which vitiates the proceedings. *State* v. *Painter,* 135 W. Va. 106, 63 S. E. 2d 86; *Demspey* v. *Poore,* 75 W. Va. 107, 83 S. E. 300; *Hughes* v. *Frum,* 41 W. Va. 445, 23 S. E. 604; *Gerling* v. *Agricultural Insurance Company,* 39 W. Va. 689, 20 S. E. 691; *State* v. *Martin,* 38 W. Va. 568, 18 S. E. 748.

The judgments of the circuit court and the intermediate court are reversed, the verdict of the jury is set aside, and this case is remanded to the Intermediate Court of Kanawha County for a new trial which is here awarded the defendant.

> *Judgments reversed,*
> *verdict set aside,*
> *new trial awarded.*