No. 20-0007 – *State of West Virginia ex rel. Troy Group, et al. v. Sims, et al.*

**FILED**
**November 24, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Hutchison, Justice, dissenting:**

I dissent because the majority opinion has – unintentionally, I think – rewritten the West Virginia Rules of Evidence and created a biased, pro-plaintiff process for the introduction of evidence. The majority opinion essentially says that a person offering evidence does not have to show the evidence is authentic; the burden is, instead, on the resisting party to prove the evidence *is not* authentic.

Rule 104(a) of the Rules of Evidence gives a trial court the discretion to assess whether evidence is admissible. Rule 104(a) provides:

> The court must decide any preliminary question about whether
> . . . evidence is admissible. In so deciding, the court is not
> bound by evidence rules, except those on privilege.

That means the trial court can consider all of the surrounding circumstances, unbound by the Rules of Evidence, to weigh whether a particular piece of evidence is admissible because it is relevant, competent, and authentic.

This case centers on that last requirement, that evidence be "authentic." Rule 901(a) provides that, for evidence to be authenticated, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The rule is simple and clear: if someone wants to introduce a piece of evidence for consideration, they first have to show the judge proof that the evidence is genuine.

1

Let me begin by relating the factual basis for the circuit court's ruling. The majority opinion sidesteps many of the facts in the record or, with a wave of judicial prerogative, declares those facts to be "self-serving" or "unpersuasive."

## A. Factual Background

This case is about a document that the defendant-petitioners purport to be a written arbitration contract. The plaintiff, Nakita Willis, claims she was discriminated against by her former employer, defendant TROY Group and various defendant employees of TROY. Before filing suit, the plaintiff's lawyers explored a settlement with the defendants and sent them a copy of their complaint. The defendants never mentioned any arbitration agreement, and even agreed that their attorney would accept service of a complaint, if one was filed.

The plaintiff then filed suit, and the defendants answered the complaint and sought to compel the plaintiff to participate in arbitration.[1] Attached to the motion was a

---

[1] The plaintiff asserts that the defendants answered the complaint and then delayed filing a motion to compel arbitration. West Virginia's law is not clear on this issue, but there is merit to the argument that the defendants waived their contractual right to arbitration by participating in litigation before asserting their contractual arbitration rights. *See* Syl. pt. 6, *Parsons v. Halliburton Energy Servs., Inc.*, 237 W. Va. 138, 785 S.E.2d 844, 848 (2016) ("The right to arbitration, like any other contract right, can be waived."). *See also*, Thomas J. Lilly, Jr., "Participation in Litigation As A Waiver of the Contractual Right to Arbitrate: Toward A Unified Theory," 92 Neb. L. Rev. 86, 89-90 (2013) ("[T]he goal of fair and efficient dispute resolution in conformity with the parties' agreement is better served by a rule that the contractual right to compel arbitration of a dispute is waived if it is not asserted by the time the defendant answers the complaint.").

document that the defendants claim is a copy of a 2004 arbitration contract signed by the plaintiff. The plaintiff challenged the authenticity of the arbitration contract and produced an affidavit saying she did not remember ever seeing or signing the document. The defendants claim she did sign the agreement because *all* employees signed similar agreements as a condition of their employment.

The circuit court heard the parties' arguments and then gave the parties ninety days to conduct discovery on the authenticity issue. In light of the defendants' claim, plaintiffs asked for copies of the arbitration agreements signed by all employees. The defendants produced these documents. The agreements signed by other employees in 2006 and 2007 appeared to be similar in content and were signed by an actual human resource employee who worked for TROY Group in 2006 and 2007. In other words, there appears to have been a consistent signing process in effect in 2006 and 2007. The agreements before 2006, however, did not appear to follow any process.

The plaintiff discovered that the defendant did not use arbitration agreements until February 2004; the employee hired immediately before the plaintiff was allegedly the first to sign such an agreement. The defendants produced only four agreements signed in 2004. Importantly, all four of the 2004 agreements are incomplete, contain irregularities or "red flags," and the agreements supposedly signed in 2004 (and 2005) are wildly different from the agreements executed in 2006 and 2007.

3

To begin, the first arbitration agreement produced by the defendants was supposedly signed by an employee in February 2004. Oddly, however, the agreement was signed and dated on a Sunday, when TROY was not expected to be open. Furthermore, the agreement does not have a countersignature by a TROY employee.

The second arbitration agreement was purportedly signed by the plaintiff in March 2004. The plaintiff claimed she never signed the document and that the signature on the document is not hers. The document was, likewise, not signed by a representative for TROY.

The third arbitration agreement produced was allegedly signed by an employee in June 2004. Oddly, the agreement was also signed on "6/11/04" by a representative of TROY, "Aimee R. Orum," the "Director of HR." However, in a later deposition, Ms. Orum confirmed she was not the "Director of HR" in June 2004. In fact, she admitted she did not start working for TROY until May 2005; her name was Aimee Olmstead until she married seven years later in 2011; and her title did not become "Director of HR" until 2015 or 2016.

The fourth arbitration agreement was purportedly signed in December 2004. However, that employee denies he ever signed an arbitration agreement. Moreover, the fourth employee asked for a copy of his employment file in 2018 and there was no arbitration agreement in the file. Remarkably, however, by Summer of 2019, the defendants were able to produce the purported agreement to the plaintiff.

4

The defendants also produced arbitration agreements from 2005. None of those agreements are signed by a TROY representative save one, which Ms. Orum signed and then dated "2005" after she became director of human resources in 2015 or 2016.

Due to the suspect inconsistencies in the arbitration agreements produced by the defendants, the plaintiff sought to take a deposition of TROY's Rule 30(b)(7) designee. Using Rule 30(b)(7), a party may ask a corporation or other entity to designate a person who can testify on behalf of the entity "to matters known or reasonably available to the organization." The plaintiffs' deposition request asked for a TROY Group witness with "knowledge of the circumstances around the purported signature of Nakita Willis being affixed to the Mutual Agreement to Arbitrate" and "knowledge of the policies and procedures of TROY Group, Inc. with regards to having employees sign a Mutual Agreement to Arbitrate."

TROY designated Ms. Orum as its Rule 30(b)(7) designee. As the majority opinion relates, Ms. Orum testified that, *today*, it is the company's policy to present the arbitration agreement to employees in their new hire paperwork, and employees are required to sign the agreement as a condition of their employment. However, this policy is unwritten. When she was asked about TROY's policy regarding arbitration agreements in 2004 when the plaintiff allegedly signed the agreement, Ms. Orum said she did not work for the company until 2005. Ms. Orum further testified that to prepare for her deposition, she spoke only with the chairman and president of the company and only to "advis[e] them that I was to be here today." She never conducted any research regarding the circumstances

or policies in effect in 2004. Ms. Orum said she could not say when, where, if or how the agreement was presented to the plaintiff; what might have been said to the plaintiff; or who, if anyone, was sure the plaintiff signed the document. She could only say that the signature seemed to match the plaintiff's signature on other documents in her digital personnel file.

As noted earlier, the plaintiff signed an affidavit in which she maintained that her signature on the purported arbitration agreement was not authentic and that she did not sign it. While the circuit court permitted the parties to conduct discovery on the authentication issue, the defendants did not take the plaintiff's deposition or offer anything substantive to challenge the plaintiff's claim she did not sign the agreement. The plaintiff followed this with a second affidavit elaborating why she was confident she did not sign the agreement. The plaintiff stated that, in March 2004 (when she supposedly signed the agreement), she was represented by a lawyer in an unrelated employment dispute and had, therefore, a heightened sensitivity to any employment documents that might alter her rights. She recalled that she would have been highly alarmed at the prospect of not having access to court, would have raised the issue with her lawyer, and might have even refused TROY's job offer.

Based on all of the evidence developed by the parties, the circuit court ruled that

> significant and troubling questions exist with regard to the authenticity of the agreement produced by the Defendants. The circumstances around the signing (or lack thereof) of the document raises a clear factual dispute. Defendants have dismissed Plaintiff's arguments in this regard and have failed

6

to provide the Court with a clear and cogent explanation for the discrepancies raised. It is clear that Defendants cannot authenticate the agreement, particularly given the confusing testimony of Ms. Orum and questions over her access to the document after it was purportedly signed.

The circuit court therefore concluded the defendants failed to establish the existence of an actual agreement between the parties. Based on this ruling, the defendants petitioned this Court for a writ of prohibition, which the majority opinion has granted. I am flummoxed by the majority opinion.

## B. Defendants Cannot Authenticate the Agreement

First, the defendants' petition to this Court is deceptive, and the majority opinion plays along with that deception. The defendants claim they – like most modern companies – scanned all copies of their employment records into a computer and then shredded the paper originals. Hence, in a gigantic red herring argument, the defendants complain the circuit judge discriminated against them and every other modern corporation because, effectively, the judge ruled companies cannot rely on digital copies but must produce the original "wet ink" version of an agreement. The majority opinion felt compelled to extemporize on this nonsensical issue, quoting Rules 1002, 1003, and 1004 for the proposition that computerized copies can be just as probative and admissible as original versions.

Problematically, the circuit court did not base its ruling on a "wet ink" versus computerized records analysis. The whole "wet ink" argument is a sparkly bauble that

drew the majority opinion's attention away from the real argument, which is that the defendants failed to produce evidence of authenticity sufficient for the circuit court to find that the plaintiff-signed arbitration agreement is what the defendants claim it is. The reason the circuit court considered the computerized documents to be inauthentic is, in part, because the handwritten signature of the "Director of HR" appeared on at least two digitized documents executed over a decade before the person became "Director of HR."

Allow me to explain how the majority opinion *should have* addressed the parties' authenticity arguments, and then I will explain how the majority opinion turned those rules upside down.

As I said earlier, Rule 104(a) requires a judge to make a preliminary ruling on the admissibility of evidence. Under Rule 104(a), the judge can weigh any form of proof, admissible or not, to determine if a piece of evidence is admissible. "Rule 104(a) requires the proponent of the testimony to show by a preponderance that the evidence is admissible." *Gentry v. Mangum*, 195 W. Va. 512, 522 n.8, 466 S.E.2d 171, 181 n.8 (1995). Hence, when the defendants stapled a copy of the arbitration agreement onto their motion to compel, the circuit judge had sole discretion to determine if the document was admissible; if it was not admissible, then it had no probative effect. The plaintiff, as we know, said the document was inadmissible because it was not authentic. Rule 901(a) provides the conceptual framework for authenticating nontestimonial evidence such as documents and objects; an object or document can be authenticated if the judge finds there is evidence showing it is what it purports to be.

8

When a defendant offers a contract as evidence, but the plaintiff responds they did not sign the contract, the burden falls upon the defendant – as the proponent – to prove by a preponderance of the evidence that the contract, as well as the signature on the contract, is authentic.

The case law abounds with instances where defendants claimed a plaintiff signed an arbitration contract but courts refused to enforce the contract because the defendant could not prove it was authentic. One such example is *Ruiz v. Moss Brothers Auto Group*, 181 Cal. Rptr. 3d 781, 787 (Cal.App. 2014), a case where an employer tried to compel an employee to arbitrate his wage dispute. The appellate court noted that "general principles of contract law determine whether the parties have entered a binding agreement to arbitrate, and the party seeking arbitration bears the burden of proving the existence of an arbitration agreement." *Id.* The court also said that "any writing must be authenticated before the writing, or secondary evidence of its content, may be received in evidence." *Id*.

The trial court in *Ruiz* refused to enforce the arbitration agreement after finding the employer failed to show the employee's digital signature on the agreement was authentic. The appellate court affirmed that determination:

> After Ruiz [the employee] averred he did not recall electronically signing the 2011 agreement, [the employer] explained in her reply declaration that the 2011 agreement was part of an employee acknowledgment form that "is" presented to all [company] employees as part of a series of changes to the company's employee handbook, and each employee is required to log into the company's HR system, using his or her

9

"unique login ID and password," to review and sign the employee acknowledgment form. Again, however, [the employer] did not explain how, or upon what basis, she inferred that the electronic signature on the 2011 agreement was "the act of" Ruiz. This left a critical gap in the evidence supporting the petition. . . .

In the face of Ruiz's failure to recall electronically signing the 2011 agreement, the fact the 2011 agreement had an electronic signature on it in the name of Ruiz, and a date and time stamp for the signature, was insufficient to support a finding that the electronic signature was, in fact, "the act of" Ruiz. For the same reason, the evidence was insufficient to support a finding that the electronic signature was what Moss Bros. claimed it was: the electronic signature of Ruiz. This was not a difficult evidentiary burden to meet, but it was not met here.

181 Cal. Rptr. 3d at 788.

Likewise, in *Fabian v. Renovate America, Inc*., 255 Cal. Rptr. 3d 695, 702 (Cal.App. 2019), a company tried to enforce an arbitration clause against a customer in a solar-panel-installation contract. The court found the agreement unenforceable because the company failed to show "who presented [the plaintiff] with a physical or electronic copy of the Contract, the specific location where the Contract was signed, the time when the Contract was signed, or how [the corporate defendant's witness] ascertained that [the plaintiff] was present when the Contract was signed." *Id.* The company also could not articulate the process by which it obtained an electronic signature from the plaintiff. Because the company could not prove the authenticity of the plaintiff's signature, it could not prove it had an enforceable arbitration agreement.

10

Like this Court, the Ohio courts (1) have expressed a "strong presumption . . . in favor of the validity of a written arbitration clause;" and (2) have said that a party "cannot be ordered to submit a claim to arbitration if that party has not agreed to arbitrate the dispute in writing." *ACRS, Inc. v. Blue Cross & Blue Shield of Minnesota*, 722 N.E.2d 1040, 1043-44 (Ohio App. 1998). Despite having these rules, Ohio courts have refused to enforce arbitration agreements that have not been proven to be authentic. One Ohio court refused to enforce an arbitration contract because the defendants failed to "produce authenticated copies of the entire contract upon which their motion to compel arbitration was based in order to provide the trial court with sufficient evidence of the existence of a written agreement to arbitrate the disputed claims." *Id.* at 1045. Another court refused to enforce a company's written arbitration agreement because the company failed to show that the document attached to the motion to compel "was in fact the exact contract agreed upon by the parties." *McGuinea v. Ganley Nissan, Inc.*, 2005-Ohio-6239, ¶ 22.

"The Texas Supreme Court, as well as this Court, has repeatedly held that the party seeking arbitration has the initial burden to establish the existence of a valid arbitration agreement." *Wright v. Hernandez*, 469 S.W.3d 744, 751 (Tex. App. 2015).

> Once the validity of an arbitration agreement has been established, there is a presumption in favor of arbitration, and the burden then shifts to the party opposing the agreement to raise an affirmative defense to the enforcement of the agreement. However, while there is a strong presumption in favor of arbitration, it arises only after a valid arbitration agreement is proven to exist.

11

*Id.* (Cleaned up). The Texas court went on to note that "[a]uthenticity is a prerequisite to admissibility." *Id.* Finally, that court made this point:

> Simply attaching a document to a pleading neither makes the document admissible as evidence, dispenses with proper foundational evidentiary requirements, or relieves a litigant of complying with other admissibility requirements. A document may only be considered authentic if a sponsoring witness vouches for its authenticity or if the document meets the requirements of self-authentication[.]

*Id.* (Cleaned up). The Texas court found that the defendant "failed to properly authenticate the arbitration agreement when it first filed its motion to compel." *Id.* However, because the plaintiff never "challenged or contested the genuineness of her signature on the document," and the defendant offered affidavits that "verified that the agreement was an exact duplicate of the original document," the court reversed course and concluded the arbitration agreement was authentic and enforceable. *Compare United Rentals, Inc. v. Smith*, 445 S.W.3d 808, 814 (Tex. App. 2014) (because "no witness could conclusively establish that the Employment Agreement in Exhibit A was a true and correct authentic copy," arbitration clause in agreement was not enforceable).

The guidelines I take away from these cases are simple. General principles of contract law determine whether the parties have entered into a binding agreement to arbitrate, and the party seeking arbitration has the initial burden of establishing the existence of a valid arbitration agreement. Only after a valid arbitration agreement is established does a presumption in favor of arbitration arise, and only then does the burden shift to the opposing party opposing to raise an affirmative defense to the agreement. A

12

defendant seeking to enforce an arbitration agreement may attach a copy to the motion to dismiss or to compel, but a trial court may consider the agreement only if "no party questions the authenticity of the document." Syl. pt. 6, *Mountaineer Fire & Rescue Equip. v. City National Bank*, ___ W.Va. ___, ___ S.E.2d ___ (No. 18-0984, November 20, 2020). Authenticity is a prerequisite to admissibility and consideration. If the plaintiff challenges the authenticity of the document, then the defendant has the burden of proving by a preponderance of the evidence that the document is what the defendant claims it is: a written arbitration contract to which both parties have clearly expressed their assent. *See generally* Menaka N. Fernando, Jennifer S. Schwartz, "Tackling Forced Arbitration," *Trial*, 31-34 (September 2018).

In this case, the plaintiff disputed the authenticity of the defendants' arbitration agreement. The defendant offered proof of its procedures *today* and how recently-hired employees are required to sign the agreement as a condition of employment. However, the Rule 30(b)(7) witness offered by the defendants had no idea of the circumstances surrounding the execution of the agreement with the plaintiff, who was (according to the defendants' evidence) the second person to sign such an agreement. While the defendants offered no evidence as to what the process was in 2004, the plaintiffs discovered that the process was quite irregular, with questionable "Director of HR" signatures appearing on documents over a decade later, or documents appearing in files in 2019 that were not produced in 2018. Further, the plaintiff definitely said it was not her

13

signature on the document and that the signature might have been digitally forged. The defendants' only answer is that it looked like plaintiff's signature.

On this record, the circuit court was clearly within its discretion to find that the defendants had failed to produce a preponderance of evidence showing that the document was, in fact, what they claimed it was: a written arbitration agreement signed by the plaintiff.

### C. Problems with the Majority Opinion

The majority opinion holds that because the defendants attached a copy of a digital document to their motion, they made "a prima facie showing of the existence of an agreement to arbitrate and that Ms. Willis then failed to overcome the presumption of its validity." The majority opinion says that merely producing a document is prima facie evidence there is a contract, and that the "burden of establishing prima facie evidence of an agreement . . . is a light one." Thereafter, according to the majority opinion, the burden shifts to the party seeking to avoid the contract.

This holding ignores the Rules of Evidence and turns the burden of proof in this case upside down. By the majority opinion's reasoning, a party can attach *any* document to a pleading or motion and, if it looks like a contract, then the trial court must declare that the document is prima facie evidence of a contract. The majority opinion further places the burden of proof on the opposing party to introduce evidence showing the

14

document *is not* a binding contract.  As I said, I anticipate plaintiffs will have a field day with this holding because, effectively, it unmoors plaintiffs from any real burden of proof.

The majority opinion also violates a basic tenet of appellate review: that this Court does not make findings of fact.  That burden lies with the trial courts, and this Court has often said that it will set those findings aside only if they are clearly erroneous:

> A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, in part, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).  Furthermore, "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion."  Syl. pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955).

The majority opinion concludes that the evidence of "irregularities" surrounding the process of forming the plaintiff's so-called contract is irrelevant.  Despite the fact that these hinky deviations "appear on documents formed proximate in time to hers and show suspicious conduct," the majority opinion fails to see their relevance because they did not occur *in the plaintiff's document*.  The majority opinion says this despite the obvious admissibility of circumstantial evidence, and the overarching authority of a trial

15

judge to consider any evidence, admissible or not, when ruling on admissibility under Rule 104(a).

Furthermore, the majority opinion rejects the plaintiff's claims that she did not sign the arbitration agreement as "self-serving," without recognizing the defendants' evidence is just as "self-serving." When the plaintiff suggests that the defendants may have copied her digital signature from elsewhere and pasted it into the agreement, the majority opinion sees "no evidence in the record to support this allegation." This conclusion seems to run contrary to the evidence showing that despite TROY Group having digitized all of its employment records, Ms. Orum's physical signature as "Director of HR" appears on a 2004 agreement executed a year before Ms. Orum was hired, seven years before she changed her last name to Orum, and over a decade before she was "Director of HR."

Additionally, the majority opinion finds that the defendants provided "compelling information" that the signature on the agreement is the plaintiff's (despite the two affidavits where the plaintiff says it is *not* her signature), then declares "there is simply no evidence in the record to suggest that it is not Ms. Willis' signature on the parties' arbitration agreement[.]" And then, with no analysis whatsoever, the majority opinion announces that the circuit court erred in its assessment of the evidence, and that the plaintiff "failed to meet her burden of demonstrating that the arbitration agreement was not authentic and that it was not her signature on that agreement."

16

Stated simply, the majority opinion chose one set of facts over the other to overturn the circuit court's findings apparently to justify reversing the circuit court. Despite our long-standing law from *Tiffany Marie S.* that "a reviewing court may not overturn a finding simply because it would have decided the case differently," the majority opinion has done just that.

## D. Conclusion

It is difficult how to measure just how much the majority opinion's holding deviates from the norm established by the Rules of Evidence. The majority opinion ignores the discretion of trial courts to determine the admissibility of evidence, and it ignores the duty of the party offering evidence to establish it as authentic. The majority opinion eviscerates a proponent's duty to show evidence is admissible, and it puts the burden on the defending party to show evidence is not admissible. It then rejects any facts in the record favorable to the defending party to reach the conclusion that, despite one party saying they never agreed to the terms, a contract exists. The opinion is, as we say back home, "a hot mess."

I therefore respectfully dissent.